IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

```
GIDDY HOLDINGS,                    )
Plaintiff/Counter Defendant        )
                                   )
VS.                                )CIVIL ACTION
                                   )NO. 1:20-cv-00434
ERNEST KIM,                        )
Defendant/Counter Plaintiff        )
```

**EXHIBIT A**

**CERTIFIED TRANSCRIPT**

-----------------------------------------

VIDEOTAPED REMOTE ORAL DEPOSITION OF

BRETT JACOBSON

JULY 1, 2021

-----------------------------------------

VIDEOTAPED REMOTE ORAL DEPOSITION OF

BRETT JACOBSON, produced as a witness at the instance of
the DEFENDANT, and duly sworn, was taken in the
above-styled and numbered cause on the 1st day of July,
2021, from 1:05 p.m. to 5:45 p.m., before Kathryn R.
Baker, CSR, RPR, in and for the State of Texas, reported
by machine shorthand, at the offices of Giddy Holdings,
1209 E Cesar Chavez Street, in the City of Austin, State
of Texas, pursuant to the Federal Rules of Civil
Procedure.

1  Dallas.  He claimed that the -- the reason he wasn't

2  willing to -- to go to the testing facilities was because

3  there was no point in him staying in Austin, because the

4  hotel that he was staying at wouldn't allow him to

5  continue staying there, it's like, since he was positive

6  for COVID.

7              I asked him why it was that he decided he

8  was going to, it's like, show up and put that on -- show

9  up in the office when he thought he was sick already, for

10 which he had no excuse, and then made up the fact that he

11 had -- he thought it was allergies.  Which is the complete

12 opposite of what he told me in the office prior to that,

13 when he faked taking medication in front of me.

14             Would you like me to go into detail about

15 that?  Because I can see your eyes getting wide.

16      Q.    I'm just writing notes.

17      A.    Your eyes got wide.  I'm looking at you.  So if

18 you'd like me to tell you --

19      Q.    I know, it's fine.

20      A.    -- how he faked taking medication, I would be

21 happy to.

22      Q.    Yes, I would.  I would like that.  Thank you.

23      A.    So he came -- Mr. Kim came into my office.  At

24 which point he made a spectacle and said that he had --

25 was running a fever, that he had been coughing and had

GIDDY HOLDINGS vs ERNEST KIM                                    Page 60
BRETT JACOBSON, 07/01/2021

1    body aches, that these were all signs of COVID, and that

2    he absolutely had COVID and needed to leave the office.

3                    And then he made a spectacle of taking out

4    a pack of pills to take the medication because he was

5    feeling so sick.  And I asked him why it was that he would

6    come to the office if he felt sick, and he said, Oh, well,

7    I didn't feel sick.  I said, That's not what you just

8    said.  You said you felt sick and you came to the office

9    anyway during a pandemic.  Why would you do that?  And he

10   said, Oh, no, it was just body aches and coughing and

11   chills.  I said, Those are all symptoms for COVID, why

12   would you have come to the office?

13                   Then he said, Well, you won't let me leave?

14   And I said, Of course, leave.  If you're sick, you should

15   leave immediately.  I don't understand why you came in.

16   He then made a spectacle and said, I have to go and take

17   these pills.

18                   I followed him out of my office after he

19   walked out the door and watched him throw the pills in the

20   garbage and then proceed to walk outside and get into his

21   car.

22                   At that point, he sent a Slack message to

23   the entire office telling them that he had COVID.

24                   On the phone call I referenced all this.

25   And I said, I watched you.  You made these things up.

1    McClelland?

2        A.   Yes.

3        Q.   All right.  And is that M-C-C-L-E-L-L-A-N-D?

4        A.   I don't know.

5        Q.   You mentioned he had a contract to fund the

6    company that he did not honor?

7        A.   Correct.

8        Q.   All right.  And did the company pursue

9    Mr. McClelland for breach of that agreement?

10       A.   No.  That would be a pretty foolish lawsuit to

11   bring.

12       Q.   Okay.  Is that -- I take it the answer is no,

13   correct?

14       A.   No.

15       Q.   All right.  And I think you mentioned that, just

16   at the end or just before the break, there was another

17   investor or investors that did not fund as they promised

18   to do.

19            Who else was that?

20       A.   Nathan Bernstein.

21       Q.   And how much funding did he commit to?

22       A.   $300,000.

23       Q.   Okay.  And did he ever eventually fund or pay

24   into the company?

25       A.   No.

GIDDY HOLDINGS vs ERNEST KIM                                  Page 76
BRETT JACOBSON, 07/01/2021

1        Q.    And what was Mr. Bernstein -- Bernstein's reason
2    for not funding the $300,000?
3        A.    The Twitter comments and not knowing what the
4    consequences of those would be.
5        Q.    And the Twitter comments by Mr. Kim?
6        A.    Correct.
7        Q.    Okay.  And did -- am I saying that right?
8    Bernstein?
9        A.    Bernstein.
10       Q.    Bernstein.
11             Mr. Bernstein communicate any of this to
12   you in writing?
13       A.    I don't recall if it was all text message -- if
14   it was text messages or just phone calls.  I would have to
15   look.
16       Q.    Do you know if there are any e-mails from
17   Mr. Bernstein regarding not funding the company?
18       A.    I don't recall.
19       Q.    Same question for Mr. McClelland; did he
20   communicate any of those -- any of the conversations about
21   not funding the company, did he communicate with you about
22   that in writing?
23       A.    I don't recall.
24             I'm sorry; what was that?
25       Q.    Who?  Me?

1   wanted to interview a chief marketing officer?

2       A.   To hire a chief marketing officer.

3       Q.   Okay.  But was there some specific reason in

4   doing that?

5       A.   A specific reason in doing what, interviewing a

6   chief marketing officer?

7       Q.   Right.  You said you were the chief marketing

8   officer before Mr. Kim.

9            Was it because you wanted to delegate that

10  responsibility or those responsibilities to somebody else?

11      A.   We wanted somebody with experience who could

12  grow a company, who had worked with larger companies, who

13  knew how to create partnerships, who knew how to build,

14  it's like, brands, it's like, larger brands, and had

15  experience in working with these companies.  All the

16  things that Mr. Kim claimed he had experience in doing.

17  None of which he does.

18      Q.   Okay.  And -- okay.

19           The first meeting you had with Mr. Kim, did

20  you guys meet in person?

21      A.   We first spoke on the phone.  We then met in

22  person.

23      Q.   All right.  Was that meeting in Austin?

24      A.   Yes.

25      Q.   Okay.  And was it just yourself and Mr. Kim?

1        A.   As well as the instructions that are given to

2   every employee, it's like, when they start working with

3   the company as to how they're supposed to log in, where

4   they're supposed to log in, that they're not to delete or

5   destroy any information, under any circumstances, which is

6   part of what leads us to the problem that, it's like,

7   Mr. Kim created by deleting and wiping all the information

8   from his laptop.

9                   It's like when he went and deleted

10  contracts he had, con -- communications with other

11  vendors, e-mails, deleting -- we didn't even know about

12  contracts he entered into, which, mind you, he had no

13  authority to do so.  And those companies then hit us up

14  for bills.  It's like for $20,000 for campaigns he had

15  authorized with no authorization to do so, had gone and

16  entered into.

17                  It's like, all the data from

18  those -- from -- from various, it's like, platforms that

19  he deleted, which set us back months and cost us hundreds

20  of thousands of dollars in revenue.  Which I can document,

21  because I can show, this is what it -- the amount of money

22  that we generate off an ad, this is how long it takes for

23  us to refine an ad, this is what the expected, it's like,

24  grow-as is, this is the expected cap.  This is the --

25  these are the amount of profit that's generated off of

1   them.

2              He deleted all the data that allowed us to

3   do so, not only for his own work, but for other people's

4   work, because he was on shared drives with people.

5              So when he deleted all that stuff, he

6   didn't only delete the stuff locally to that computer,

7   deleted the stuff that was on shared drives.  Cost us a

8   fortune.

9        Q.   Let's -- and let's -- let's dive into that now.

10             These contracts that you allege or the

11   company alleges that Mr. Kim entered into --

12        A.   I don't allege.  He did it.  The companies say

13   that he did it.  They contacted us asking for the money.

14   There's no allegation here --

15        Q.   Just let me finish.

16             The company alleges that Mr. Kim entered

17   into these contracts without authority.

18             Who were those contracts with?

19        A.   I don't know all of the companies, because,

20   unfortunately, Mr. Kim deleted all the information.  So

21   some of the companies have contacted us through

22   collections agencies coming to us and saying, You owe us

23   $20,000.  And I say, For what?  And they say, For the ads

24   that were placed in blah, blah, blah.  And I'm like, What

25   company was this booked through?  When was this booked?

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

GIDDY HOLDINGS vs ERNEST KIM                                    Page 128
BRETT JACOBSON, 07/01/2021

1    We have no records of it.  Oh, look at that, it's booked

2    the entire time, it's like, that Mr. Kim was employed in

3    the -- in the company.

4         Q.   And what other companies do you know of?

5    Which -- what companies are those?

6         A.   I don't have that information in front of me.

7    These are not companies that I work with.

8              You want to know about companies I work

9    with on a regular basis, I can give you that information.

10             The companies that he dealt with that I had

11   nothing to do with and that I never authorized spending

12   money with, and that he chose to, it's like, then delete

13   the information or run off with, it's like, there is no

14   way -- I don't have any relationships with them.  I don't

15   know them.  And I certainly don't know the collections

16   firms they hired in order to pursue their -- their

17   actions.  It's like, that's all information that Mr. Kim

18   has.

19        Q.   Well, what companies are now pursuing collection

20   against Giddy?

21        A.   I don't have the information in front of me.

22        Q.   Okay.

23        A.   There are numerous advertising platforms.

24        Q.   That Mr. Kim entered into contracts with?

25        A.   Yes.

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1          And you just answered the question, but let

2     me do it cleanly here.

3              How much money, cost, damages did -- were

4     caused by Mr. Kim entering into these contracts?

5     A.   Those are two different questions.  Are you

6     asking about damages or are you asking about the amount of

7     money he spent with advertising companies without

8     authorization?

9     Q.   I'm asking about damages that are being claimed

10    in this lawsuit.

11             So what amount of damages are being claimed

12    by Giddy that were caused by Mr. Kim entering into these

13    contracts?

14    A.   Hundreds of thousands of dollars.  The exact

15    dollar amount is depending on how, it's like, the court

16    allows us and the judge allows us to demonstrate those

17    damages and the exact dollar amount of them.

18             But how much damages, hundreds of

19    thousands.  Not just the cost of the ads themselves, but

20    the lost revenue that we missed out on because I had to

21    pay bills for ads that never should have been run in the

22    first place.

23             The loss of our credit, it's like our

24    standing -- as a result of being sent to collections for

25    bills that I never authorized, that I never knew we were

1   going to be -- that we didn't even know existed.

2        Q.   Have you or anyone on behalf of Giddy done any

3   kind of calculation as to the amount of those damages?

4        A.   We have.

5        Q.   Okay.  And what was the result of that

6   calculation?

7        A.   It depends on what -- where -- what -- over what

8   time and what was going to be acceptable in terms of, it's

9   like, valuing, it's like, a damage.

10                  So, for example, a damage of credit and

11  what it cost us in the extrapolated amount out versus the

12  amount of an invoice that wasn't paid for a contract that

13  should never have been entered.

14                  No matter how you calculate it, it's

15  hundreds of thousands of dollars.  The exact dollar amount

16  depends on the exact calculation that's going to be used

17  in order to pin that down.

18        Q.   Okay.  So what -- what was the amount -- what's

19  the amount of damages claimed for loss of credit?

20        A.   I don't have the numbers in front of me.

21        Q.   Okay.  What is the amount of damages for the

22  contracts that -- of just the face value of the contracts

23  that Mr. Kim entered into?

24        A.   Of the ones that I know of?  Of the ones that I

25  know of, approximately $40,000.  But that is not to say

1  that that's the full scope of them.

2       Q.   All right.  What is the amount of damages

3  caused --

4       A.   Oh; I'm sorry.  I just need to interrupt here.

5            You keep saying damages, and you're

6  lumping -- you're commingling terms here.

7            Are you talking about the face value of

8  these things or are you talking about the amount the

9  company was damaged?  Because my argument is to the amount

10  of money that the company was damaged is millions of

11  dollars.

12           The amount that we can actually seek in

13  damages based on the statutory limits is a different

14  conversation.

15           The amount of money that we actually had to

16  pay out of pocket as a result of his actions is a

17  different amount of money as well.

18           So you're talk -- you're commingling these

19  all as what's the damages, and trying to pin me down to a

20  single number, when that's not an accurate question to

21  ask.

22       Q.   Okay.  Then I'll make it -- maybe try it this

23  way.

24            The company is claiming damages were caused

25  by Mr. Kim, correct?

1   Q.   Okay.  But there was at some point an investment

2   by Mr. Kevin Harrington, correct?

3   A.   No, there was not.  Mr. Harrington is not as an

4   individual.  There is an entity that was controlled by

5   Mr. Harrington that made an investment in the company, but

6   Mr. Harrington did not personally invest in the company.

7   Q.   Okay.  And what's the name of the company that

8   invested -- I don't want to say on behalf of Kevin

9   Harrington, but what's the company affiliated with

10  Mr. Harrington?

11  A.   I can't remember the exact name.  It's an

12  acronym.  It's like KCH something or other.

13  Q.   Okay.  And that company did at some point invest

14  money into Giddy Holdings?

15  A.   Yes, prior to Mr. Kim.

16  Q.   Got it.

17       And then after the tweets, they have not

18  invested again?

19  A.   Correct.

20  Q.   And we talked about Nathan Bernstein.

21  A.   Uh-huh.

22  Q.   Adam Blum; was Adam Blum an investor of Giddy

23  Holdings?

24  A.   No.  Again, you're conflating individuals and

25  entities.  So there -- these are -- it's like, did -- was

1 round and invested again in the next round.

2     Q.  Okay.  All right.  Okay.  All right.  Jumping

3 over now to the -- the actual claims in this lawsuit.  I

4 want to try to go through these as quick as we can.

5         You understand that Giddy Holdings has

6 clearly or, obviously, filed a lawsuit against Mr. Kim,

7 asserting several causes of action.

8         Are you aware of that?

9     A.  Yes.

10     Q.  All right.  One of the causes of action is the

11 Computer Fraud and Abuse Act.  And I'm just looking at the

12 complaint here.

13         It says that Defendant, Mr. Kim, was not

14 authorized to access Plaintiff's systems following his

15 termination.  However, Defendant gained access to same for

16 the purpose of hiding, transferring, or deleting

17 Plaintiff's protected information.

18         The question is:  What protected

19 information did Mr. Kim allegedly hide, transfer or

20 delete?

21     A.  I believe I have answered these questions.

22         All of the vendors that he did business

23 with, AOs, IOs that he signed, as well as, it's like,

24 agreements that he had signed, the data and recording

25 of -- it's like, of ads and ad campaigns that had been

GIDDY HOLDINGS vs ERNEST KIM                              Page 142
BRETT JACOBSON, 07/01/2021

1    run, which he deleted from the system.  Not only from his
2    own computer, but also from, it's like the cloud that
3    other people had access to that he was an authorized user
4    on.
5                    He deleted the information and data that
6    was on the computer for companies he had pitched to.  And
7    partnerships that he had presented to other companies.  I
8    have no idea what he sent to -- to those companies.
9                    There was confidential information about,
10   it's like, how we structure and how we targeted, its like,
11   people for advertising that he deleted off of the
12   computers and off of, its like, connected network
13   computers.
14                   There was information about how we do, it's
15   like, our allocations.  There was information about
16   strategies that he had been sent, it's like, which
17   competitors, it's like, should have no access to that he
18   deleted.
19                   He deleted all kinds of data and
20   information that we can't get back.  It's like, I can't
21   re-create -- I can re-create a pitch deck, but I can't
22   re-create a -- it's like, the results of an ad campaign.
23   And those -- the results of that allow us to determine how
24   we can run the next ad campaign, and determine directly
25   the effectiveness of the next ad campaign.

1              If I don't know whether or not an ad was

2    successful or not, I now need to do that entire experiment

3    again.  I have to do that entire test over again.  You're

4    talking about hundreds of thousands of dollars' worth of

5    testing for which I don't have any results because Mr. Kim

6    has deleted it all.

7         Q.   All right.  So how do we know that he deleted

8    this information?

9         A.   He admitted that he deleted it all --

10        Q.   But how --

11        A.   -- in his own deposition.

12        Q.   How do we know -- how do we know that he deleted

13   -- well, strike that.

14              What -- where was this information kept?

15   Was this kept in a cloud platform?

16        A.   Both on his laptop, as well as in shared drives.

17        Q.   Okay.  And in these shared drives, have you or

18   the company investigated what was there and what was

19   deleted?

20        A.   Yes.

21        Q.   Okay.  And so what -- as a result of that, what

22   was deleted, not just categories, but where and how did he

23   delete the information from the cloud?

24              MR. STOKER:  Objection.

25        A.   I don't understand what the question is.

GIDDY HOLDINGS vs ERNEST KIM                              Page 145
BRETT JACOBSON, 07/01/2021

1   see it.  You can't delete that information in any way.

2              But when you're talking about data that's

3   put on a third-party site, for the very nature of the way

4   that those sites work, they don't keep that data.  It's

5   like, they don't access that data, then nor do they allow

6   other people to access that data.  If they allowed for

7   that, it would defeat the purpose of anybody using a

8   shared platform, shared drive, a cloud system, because

9   they would say, oh, yeah, the FBI, you want the

10  information, here you go; some other individual, you want

11  the information, here you go.

12             When somebody deletes and wipes those

13  drives, they wipe them.  They're gone.  You cannot get it

14  back, it's like, after somebody does that.

15             And as he said in his own, it's like,

16  testimony in his deposition, that he went online and

17  looked at videos on how to wipe the computer and how to

18  wipe these drives himself.  It's like he watched the

19  videos on how to do it.  He didn't just return the

20  property.

21             Any other time that we had an employee who

22  is no longer with the company, they returned the computer

23  to us intact, without going and accessing third-party

24  systems, without accessing the information on the computer

25  and wiping those things clean.

1              He wiped everything clean.  It's like,

2    reset everything to factory settings.  And we lost data

3    that cost us hundreds of thousands of dollars.

4              All of those ads needed to be run again

5    because of his actions.

6              And I can demonstrate, and I have no

7    problem doing so, that those same ads had to be run a

8    second time because we didn't have the end results.  And

9    at no other time do we ever rerun ads again the exact same

10   way, the exact same specifications.  And I can document

11   that, it's like, without any problem whatsoever.  No

12   problem doing so, because -- and the only reason that we

13   had to do that was because of Mr. Kim's actions.

14             It's like, our -- we have employees at the

15   company who will testify to that without any issue.

16        Q.   Okay.  Well, did -- did Giddy ever hire an

17   outside company or any kind of computer forensic expert to

18   see what information was deleted or --

19        A.   We knew what information was deleted.

20        Q.   What's that?

21        A.   We know what information was deleted.  We don't

22   need a third party to tell us what was deleted.  We know

23   what was deleted.

24        Q.   Well, how -- what "we" are you referring to?

25        A.   Are you talking about -- you're talking about

GIDDY HOLDINGS vs ERNEST KIM                          Page 166
BRETT JACOBSON, 07/01/2021

```
 1        A.   Well, there's two different aspects.  One is the
 2   aspect of him threatening to disclose information, and
 3   that he was texting or Twitter with reporters, telling
 4   them that he was going to disclose information about the
 5   company.  And he had a confidentiality agreement, so that
 6   was -- those were in his own words.  We can go through and
 7   read each of those tweets into the record, but they're
 8   self-explanatory.
 9                    He tells them that he is going to disclose
10   confidential information.  He tells them that he's going
11   to do it publicly.
12                    In addition to which the mere fact that
13   Metta World Peace is an investor is confidential
14   information.  That's something that he did not want
15   anybody to know about, and he references it in the tweets.
16        Q.   Okay.
17        A.   So you're tying a man who specifically did not
18   want to be a spokesperson, it's like, who was worried
19   about his reputation and worried about being associated
20   with a company for erectile dysfunction, it's like, and
21   that's somehow tainting his other endorsement deals or his
22   perception is being less in the -- in his -- less than his
23   value, in terms of getting other endorsement deals, and
24   then putting it on blast that he's involved in the
25   company.
```

GIDDY HOLDINGS vs ERNEST KIM                                    Page 176
BRETT JACOBSON, 07/01/2021

1    review this language.

2         A.    Sorry; it's got to stop moving.

3         Q.    **There must be a lag or something.**

4         A.    Yeah, probably.

5               Can you slide it up further.

6         Q.    **Yeah.**

7         A.    (Witness reviews document.)

8               Yes.

9         Q.    Okay.  And so -- and just, again, so I know,

10   what evidence of -- or what -- strike that.

11               **What trade secrets are you claiming that**

12   **Mr. Kim misappropriated?**

13        A.    This goes back to all the data that's on the

14   computer, deleting the information.  He clearly

15   transferred the information, because he states in his

16   tweets to third parties that he has the information.

17               So all of this talk about how Mr. Kim

18   doesn't know what was deleted or doesn't have it, is --

19   obviously, he's either lying to the Justice Department,

20   lying to the Small Business Association, lying to all

21   these organizations where he says he has it, or he's

22   lying, it's like, and saying -- when he doesn't have it,

23   it's like, or he actually did take it.

24               So which party is he lying to?

25        Q.    But do you know --

GIDDY HOLDINGS vs ERNEST KIM                        Page 177
BRETT JACOBSON, 07/01/2021

1        A.   We know he deleted the information.  We know he
2    transferred the information, because we can see it.  It's
3    not there anymore.  All of that information, it's like,
4    was totally destroyed.
5        Q.   Okay.   But do you know or are you aware of
6    any -- any evidence that Mr. Kim used any trade secrets of
7    Giddy and -- at his next job or some -- in some way to
8    benefit him, you know, financially; meaning, did he -- did
9    he give this to a competitor?  Did he give the trade
10   secrets away to someone?  Is he using them for his own
11   benefit?
12       A.   That, to my understanding, is not the full scope
13   of this.
14            Did he give information to third parties?
15   I don't know.  He was in possession of all kinds of
16   confidential information.  He reported to and said in his
17   own deposition, he had all this stuff and had copies of
18   stuff.
19            It's like, he made those claims to the
20   Justice Department and the SBA.  He spoke to his
21   brother-in-law at the FDA about our product.  I don't know
22   what he said to -- to these people.  But whatever he said
23   was either defamatory or it was a violation of trade
24   secrets.  There's no other -- there is nothing else it
25   could.

GIDDY HOLDINGS vs ERNEST KIM                                    Page 178
BRETT JACOBSON, 07/01/2021

1        Q.   All right --

2        A.   But there was -- I mean, so he took stuff he

3   wasn't supposed to; he disposed of stuff he wasn't

4   supposed to, or he lied, in which case it's defamation.

5             Pick your poison.  Which one you want?

6        Q.   Well, I'm only asking about any use of this --

7   of the trade secrets.

8             So are you aware of any use of it?  Not

9   deleting it, but any use of this information --

10       A.   Yes, he used to -- he used trade secrets and

11  used information to go to -- it's like, to go to

12  authorities.

13            It's like, as well as going to -- to

14  Twitter and saying that he -- and telling the press he was

15  disclosing information about the company.

16            There's no -- there's no question to

17  whether or not he was disclosing anything that's

18  confidential.  There is an NDA and non-disparagement

19  agreement with the company.

20            He texted, it's like, and messaged people

21  that he knew.  Here's a perfect example.  He knew Mark

22  Cuban was an investor and there was -- thought about

23  investing in the company.  We had meetings with him.  And

24  he referenced that in the tweet.  He knew that -- that

25  Metta World Peace was an investor in the company, and he

1   referenced that in the tweet.

2           So, yes, did he use confidential

3   information to attack the company?  Yes, he did.

4       Q.   Okay.  All right.  And those are -- so that

5   information, those are trade secrets; the identity of any

6   investors --

7       A.   Absolutely.

8       Q.   -- certain investors, those are trade secrets

9   that Giddy is alleging that Mr. Kim misappropriated?

10      A.   Absolutely.

11      Q.   All right.  So Count 6, breach of fiduciary

12  duties, do you see that?

13      A.   Yes.

14      Q.   And if you would like, go ahead and review that

15  information.

16      A.   (Witness reviews document.)

17           Yeah.

18      Q.   All right.  And the claim here is that Mr. Kim

19  breached his fiduciary duties by deleting the information

20  from his -- from his computer and e-mails, things of

21  that -- things of that nature; is that correct?

22      A.   Yes.

23      Q.   Okay.

24      A.   Breached his fiduciary duty by not, it's like,

25  giving us accurate information on his resumé.  He breached

1  maybe an internal employee to do that investigation?

2       A.   Correct.

3       Q.   All right.  Was the hard drive actually was --

4  was it mapped or was an image taken of the hard drive?

5       A.   There was nothing on the hard drive.

6       Q.   Okay.  But that -- the question is:  Was an

7  image taken of the hard drive?

8       A.   I don't know.  I would have to ask.

9       Q.   Are you aware of any inspection or analysis that

10 has been done of the laptop to determine what was deleted

11 or what was removed?

12      A.   Yes.

13      Q.   Okay.  And what was that?

14      A.   What do you mean?

15      Q.   You said there was -- you've seen an analysis of

16 that.  I guess, tell me about that.

17           Who performed the investigation and what

18 was the result of that investigation?

19      A.   There were numerous developers and IT personnel

20 at the company who sought to recover the information, who

21 have years of background in this, who have, it's like, our

22 one -- it's like, who has 30 years of experience and,

23 actually, the highest levels of security clearances you

24 could have in multiple -- in multiple fields, and work for

25 the federal government.  And they were unable to recover

GIDDY HOLDINGS vs ERNEST KIM                                    Page 192
BRETT JACOBSON, 07/01/2021

```
 1   anything.
 2        Q.   Okay.  And was there a record done at the time?
 3   Was -- was there any kind of documentation of what they
 4   did to inspect the laptop?
 5        A.   I would have to ask.
 6        Q.   I think we're about to...
 7             When -- one quick question, and I typically
 8   ask this at the beginning.
 9             Have you ever been arrested at any point in
10   time?
11        A.   Never.
12        Q.   Okay.  Ever been convicted of a crime?
13        A.   Never.
14        Q.   Okay.  All right.  That is all that I have --
15        A.   I'm sorry.  Is -- is a speeding ticket
16   considered a crime?
17        Q.   Technically, yes.
18        A.   I've had a speeding ticket.  But other than
19   that, no, I've never been arrested or been convicted of
20   any crimes.  Speeding ticket would be the only thing.  I
21   just want to clarify the record.
22        Q.   Yeah.  Well, same here.  So...
23             But, no, that's -- I'm talking about things
24   above speeding tickets.
25        A.   No.
```