UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

GIDDY HOLDINGS, INC,          ) Civil Action No.
                              ) 1:20-cv-00434-LY
              Plaintiff,      )
                              )
VS.                           )
                              )
ERNEST KIM,                   )
                              )
                              )
                              )
              Defendant.      )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

ERNEST KIM

December 18, 2020

Volume 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF ERNEST KIM, produced as a

witness at the instance of the Plaintiff, and duly

sworn, was taken in the above-styled and -numbered cause

on the 18th day of December, 2020, from 9:00 a.m. to

4:10 p.m., via video conferencing, before Deborah Renee

Quarles, Notary for the State of Texas, reported by

machine shorthand, remotely from Johnson County, Texas,

pursuant to the Texas Rules of Civil Procedure, the

Texas Supreme Court Emergency Order Regarding the

Covid-19 State of Disaster, and the provisions stated on

the record or attached hereto.

Ernest Kim Vol 1
December 18, 2020                                                    14

```
 1        A.  No.
 2        Q.  Did you search for documents for today's
 3   deposition?
 4        A.  No.
 5        Q.  Do you have any documents in your possession
 6   from your employment with Giddy?
 7        A.  No.
 8        Q.  Do you have any documents in your possession
 9   that relate to your defenses to Giddy's claims or your
10   counter claim?
11              (Simultaneous speaking interruption).
12              MR. ERICK:  Object to form, sorry.
13              THE WITNESS:  Yes.
14        Q.  (BY MR. STOKER)  Are you able to explain what
15   those documents are?
16        A.  Screen shots of Brett Jacobson's approval for
17   marketing budget to be spent, my offer letter --
18   amendment to offer letter.
19        Q.  Anything else?
20        A.  And letters I received from your office, as
21   well as from Mr. Clark.
22        Q.  Do you have any e-mails from your employment
23   with Giddy?
24        A.  No.  Other than screen shots to -- other than
25   screen shots, no.
```

Ernest Kim Vol 1
December 18, 2020

15

1      Q.   Those screen shots are from your phone?

2      A.   Yes.

3      Q.   How did you access the e-mails that you took

4  screen shots of?

5      A.   I took screen shots when I was accused of

6  spending marketing budgets that she didn't approve of.

7      Q.   And when was that?   When were you accused of

8  spending marketing funds that weren't approved?

9      A.   I don't remember.

10      Q.   Was it during your employment?

11      A.   No.

12      Q.   After you were terminated from Giddy, you were

13  accused of spending marketing funds that weren't

14  approved?

15      A.   Yes.

16      Q.   And at that time you took screen shots of

17  e-mails?

18      A.   Yes.

19      Q.   And these screen shots were from your phone?

20      A.   Yes.

21      Q.   How did you access the e-mails that you took

22  screen shots of?

23      A.   It was in my phone.

24      Q.   Your Giddy e-mail was on your phone?

25      A.   Yes.

Ernest Kim Vol 1
December 18, 2020

16

1          Q.   And it stayed on your phone after your

2   employment?

3          A.   Yes.

4          Q.   Is it still on your phone?

5          A.   No.

6          Q.   What happened to it?

7          A.   I removed the account.

8          Q.   What was the account name?

9          A.   I don't recall.

10          Q.   Was it a Gmail account?

11          A.   No.   It was a company e-mail account.

12          Q.   So the app on your phone was a -- was it like

13   an Outlook mail app?   What was it?

14          A.   It was an Apple iPhone mail app.

15          Q.   Okay.   And that phone that had the Apple app on

16   it, is that the same phone that you currently have?

17          A.   Yes.

18          Q.   Do you recall when you deleted that app?

19          A.   I don't know that exactly.

20          Q.   Did somebody tell you to delete it?

21          A.   No.

22          Q.   Did you take screen shots of all the e-mails in

23   that account?

24          A.   No.

25          Q.   Just select e-mails?

1        A.   Yes.

2        Q.   What -- how did you decide which e-mails to

3    take screenshots of?

4        A.   Only the ones that I was being accused.

5        Q.   And that's the marketing budget e-mails?

6        A.   Yes.

7        Q.   Did you -- and you still have those screen

8    shots in your possession, correct?

9        A.   No; I gave it to my attorney.

10       Q.   Did you take screen shots of any -- that

11   contained any Giddy confidential information?

12       A.   No.

13       Q.   Other than the e-mails on your phone, did you

14   search any personal devices for e-mails pertaining to

15   the claims against you or the claims that you have

16   against Giddy?

17       A.   Could you elaborate on that?

18       Q.   Did you search -- let's go through this.

19            What personal computer devices do you have

20   in your home?

21       A.   I have my laptop in my home.

22       Q.   Do you have a PC?

23       A.   Yes.

24       Q.   Do you have a tablet?

25       A.   No.

Ernest Kim Vol 1
December 18, 2020                                          75

1      Q.  Okay.  After that call, eventually you came to

2  an agreement and signed an offer letter?

3      A.  It was not an offer letter; it was an

4  employment contract.

5      Q.  You signed the document that laid out the terms

6  of your employment; is that fair to say?

7      A.  Yes.

8      Q.  And then you started working with Giddy.

9      A.  Yes.

10      Q.  Do you remember when the first date was?

11      A.  March 2nd.

12      Q.  And on March 2nd did you report, physically, to

13  the office?

14      A.  Yes.

15      Q.  That was in Austin?

16      A.  Yes.

17      Q.  Who did you report to that day?

18      A.  Brett Jacobson.

19      Q.  Okay.  So when you arrived at the office, you

20  sat down with Mr. Jacobson?

21      A.  No.  The office was closed; they didn't open

22  yet.

23      Q.  Okay.  So you arrived at the office.  When the

24  office first opened, who did you first meet with?

25      A.  I don't know who I met with.  Whoever opened

Ernest Kim Vol 1
December 18, 2020                                        113

1  recall today do not even allow you to even mention their
2  names; but when you were hired by Giddy, you did not
3  read the documents they gave you?
4      A.  I skimmed through but I didn't read them; and I
5  don't understand the technical details of these legal
6  languages --
7      Q.  Okay.
8      A.  -- So I asked what this document was.  They
9  said, "Something everybody signs, sign here."  So that's
10  what I did.
11      Q.  On the first page of the document, it says
12  confidentiality and it says company confidential
13  information.  Do you see that?
14      A.  Yes.
15      Q.  Did you understand that working with Giddy as
16  chief marketing officer, you had access to the company's
17  confidential information?
18      A.  I don't have access to the company's
19  confidential information.
20      Q.  Did you understand that you would have access
21  to information related to Giddy's product?
22      A.  I didn't have access to any information about
23  the product.
24      Q.  Did you have access to Giddy's information
25  about Giddy's marketing plans?

Ernest Kim Vol 1
December 18, 2020

114

1      A.   There were no marketing plans.

2      Q.   Mr. Kim, it was your responsibility to do

3  marketing for Giddy, correct?

4      A.   Yes, I created the marketing plans.  Before I

5  joined, there wasn't any.

6      Q.   You're saying there were no marketing efforts

7  for Giddy prior to your start?

8      A.   There was marketing effort; but there was no

9  marketing plans.

10      Q.   You were provided information about those

11  marketing efforts; correct?

12      A.   Which efforts?

13      Q.   About the marketing efforts of Giddy.

14      A.   Very high-level view, yes.

15      Q.   As chief marketing officer, in order to market

16  the products, don't you need to know about the product?

17      A.   Yes.

18      Q.   So you were provided information about the

19  product?

20      A.   Very-high level product that's available on the

21  website.  Yes.

22      Q.   I'm not asking you to tell me today if you deem

23  it confidential or not.  Because you already told me you

24  don't have the legal expertise to do that.  I'm just

25  asking for you to confirm as being hired as chief

Ernest Kim Vol 1
December 18, 2020                                    115

1  marketing officer that you were provided information

2  about Giddy's operations.  Its marketing and its

3  product.

4      A.  I did not have any information about

5  operations.  I had very-high level information about the

6  product and marketing.  Very little information about

7  what type of marketing was done.

8      Q.  You testified earlier that you had a

9  discussion, at least one discussion with Mr. Jacobson

10 about plans for acquisition.

11     A.  No; there was no questions about it.  No

12 conversations about acquisitions.

13     Q.  You testified earlier, Mr. Kim, that you

14 discussed that the plan to get acquired in your

15 interview.

16     A.  No plan to -- I don't know what you are

17 referring to.  What acquisitions?

18     Q.  So in your interview, you did not discuss

19 Giddy's plan to get acquired?

20     A.  Giddy's plans to get acquired?  No.

21     Q.  Okay.  You also testified that you interviewed

22 employees.  Or candidates.

23     A.  Candidates; yes.

24     Q.  So as part of that interview, did you know what

25 the candidates were interviewing for?

1       A.   Yes.

2       Q.   Okay.   So you were provided information about

3  Giddy's plans to hire somebody, correct?

4       A.   Yes.

5       Q.   Okay.

6       A.   In marketing, yes.

7       Q.   When you are -- earlier you testified that you

8  believed you had authority to sign contracts on behalf

9  of Giddy; correct?

10       A.   Yes.

11       Q.   Okay.   So in order to do that, you had to

12  discuss the terms of the marketing contracts with Mr.

13  Jacobson, correct?

14       A.   Yes.

15       Q.   Is that not information about the marketing

16  efforts of Giddy?

17       A.   Marketing efforts of Giddy that we are trying

18  to do?  Yes.

19       Q.   Okay.

20       A.   Previous work?  No.

21       Q.   Is that information about Giddy's operations?

22       A.   No.

23       Q.   It's not?  Why is it not?

24       A.   Operations is a broad term.  So marketing

25  operations, yes.  Company operations, no.

Ernest Kim Vol 1
December 18, 2020                                    120

1        Q.   And you did a great job at your job?

2        A.   I don't know; because I don't have any access

3    to the data to know whether I did a great job or not.

4        Q.   I'm going to turn your attention to what's on

5    the screen as Section B.  Can you please take a second

6    to read that over?

7        A.   Okay.

8        Q.   Did you understand that you -- under this --

9    did you understand the terms of this provision when you

10   signed the agreement?

11       A.   No.

12       Q.   Do you understand that you were not able to

13   share the company's confidential information with third

14   parties?

15       A.   The general understanding?  Yes.

16       Q.   Okay.  Do you understand you are still not able

17   to use that information?

18       A.   I have to reread to know what the timeframe is.

19       Q.   Okay.  Go ahead and reread it and let me know

20   when you're ready.

21       A.   Okay.

22       Q.   Do you understand?  Did you read the last

23   sentence of Section B?  Do you understand what that

24   means?

25       A.   No.

1      Q.   (Reading) "I understand that my obligations

2   under this section shall continue after my termination

3   of employment."

4      A.   Okay.

5      Q.   See that?

6      A.   Yep.

7      Q.   Okay.   So do you now understand that your

8   nonuse and nondisclosure obligations continue?

9      A.   Yes.

10      Q.   Okay.  Do you have any documents signed by

11   Giddy that you claim supersede the obligations under

12   this agreement?

13      A.   None that I remember.

14      Q.   Any that amend or revise this agreement?

15      A.   No.

16      Q.   Did you talk with Mr. Jacobson about ad

17   spending budgets?

18      A.   Yes.

19      Q.   Do you know how many -- were there sales before

20   you came on?

21      A.   I believe so.

22      Q.   Okay.  Did you have access to the sales data?

23      A.   No.

24      Q.   Did you have access to where sales came from?

25      A.   No.

Ernest Kim Vol 1
December 18, 2020                                    179

```
 1   confidential.
 2             MR. ERICK:  Objection.  Form.
 3        Q.  (BY MR. STOKER)  So April 3rd, when you left
 4   10:50 a.m. approximately, was that the last time you
 5   worked at the Giddy office?
 6        A.  Last time physically in the Giddy office.  Yes.
 7        Q.  Did you work that day, April 3rd?
 8        A.  No, this was on sick day the rest of the day.
 9        Q.  And did you work over that weekend?
10        A.  No.
11        Q.  Okay.  How about April 6th?  I believe that
12   would be the following Monday?
13        A.  Following Monday, I had instructions not to
14   work.
15        Q.  Okay.
16        A.  I was using a sick day by COVID regulation.
17        Q.  Okay.  Did you at some point lose access to the
18   Giddy platform?
19        A.  Yes; they blocked all my communications as I
20   was driving up on Friday.
21        Q.  Okay.  So as of Friday, April 3rd, you did not
22   have access to your --
23        A.  They restored something but I don't remember
24   what they restored because they went back and forth.
25        Q.  Well the laptop.  Were you able to plug into --
```

Ernest Kim Vol 1
December 18, 2020                                            180

1    the MacBook.  Were you able to plug into that?

2         A.   That's not within the Giddy network; so yes,

3    I'm able to access it.

4         Q.   And were you able to access your e-mail?

5         A.   I don't think it was able to.  I don't

6    remember.

7         Q.   You don't remember accessing it or using e-mail

8    that day?

9         A.   I think they blocked my e-mail access.  So I

10   couldn't do anything.

11        Q.   Okay.

12             MR. STOKER:  So on the screen is what's

13   marked Exhibit 12.  Do you see that?

14             THE WITNESS:  No, no.

15             MR. STOKER:  No?  I'm sorry.  How about

16   now?

17             THE WITNESS:  Yes.

18             MR. STOKER:  Okay, Great.

19             (Exhibit No. 12 marked.)

20        Q.   (BY MR. STOKER)  Do you recognize this e-mail

21   chain?

22        A.   Yes.

23        Q.   This is an e-mail from Mr. Clark --

24        A.   Yes.

25        Q.   -- on April 3rd, do you remember receiving this

```
 1   a potential symptom of COVID-19?
 2        A.   Actually, I didn't know about the body ache.
 3        Q.   But you knew about the fever?
 4        A.   I don't recall whether fever was one of them
 5   that people highlighted.
 6        Q.   So you responded to this e-mail?
 7        A.   Yes.
 8        Q.   Did you get a response to your response?
 9        A.   I don't know if I did.
10        Q.   Are you able to see the new document on this
11   screen?
12        A.   Yes.
13        Q.   Okay?
14             MR. STOKER:   This is marked as Exhibit 14.
15             THE WITNESS:   Yes.
16        Q.   (BY MR. STOKER)   And the first e-mail at the
17   bottom of the screen is again from Mr. Clark, and it's
18   dated April 13, 2020.
19             Do you see that?
20             (Exhibit No. 14 marked.)
21        A.   Yes.
22        Q.   Okay.   And it's asking that you return the
23   property in your possession.
24        A.   Yes.
25        Q.   Okay.   Did you have any property in your
```

Ernest Kim Vol 1
December 18, 2020                                        186

1    possession on April 13, 2020?

2         A.   I don't know if I did or when I returned it.

3         Q.   Okay.  The picture above here is an e-mail.  Is

4    that from your Gmail account, Ernie Kim?

5         A.   Yes, yes it is.

6         Q.   And it seems to be a screen shot of a FedEx.

7         A.   Yes.

8         Q.   Do you recall going to Federal Express --

9         A.   Yes.

10        Q.   -- April 13th?

11        A.   I don't know the date; but if that's when I

12   went, yes.

13        Q.   Okay.  And if you look at the --  the picture

14   of receipt there --

15        A.   Yes.

16        Q.   -- I think this date of April 13th.  Do you see

17   that?

18        A.   Yes.

19        Q.   Okay.  So is this a receipt of your FedEx

20   package with Giddy property being sent back?

21        A.   Yes.

22        Q.   Okay.  So you did have Giddy property on April

23   13th, 2020?

24        A.   Yes.

25        Q.   Okay.  If we go back to the beginning of the

1    stream, it says, "On April 6, you were notified and

2    instructed to return Giddy's property that was in your

3    possession."  Do you recall that conversation?

4         A.  I believe so.

5         Q.  Okay.  So on April 6th, is the date that your

6    employment was terminated; is that right?

7         A.  I don't have the exact date.

8         Q.  Does it sound about right?

9         A.  It sounds about right.

10        Q.  Okay.  April 13th is seven days later; you

11   would agree?

12        A.  Yes.  The general guidelines for the City of

13   Dallas is, if you are tested for Coronavirus, you should

14   quarantine yourself at home.

15        Q.  Who is saying that?

16        A.  They forced me to get tested. So I went to

17   Dallas Testing Center to get tested and the policy that

18   they had created was if you are ever tested for

19   Coronavirus, you should quarantine yourself for 14 days

20   until you get your test result that says you don't have

21   it.

22        Q.  Okay.  So you're saying that you were tested in

23   Dallas for COVID-19?

24        A.  Yes.

25        Q.  Okay.  What date was that?

Ernest Kim Vol 1
December 18, 2020

189

1      Q.   Did you have -- did you access the Giddy e-mail
2   on your iPhone between April 6th and April 13th?
3      A.   No; I did not have anymore access so I don't
4   think so.  They blocked my access completely.   So I had
5   no access to anything.
6      Q.   But earlier you stated, correct me if I'm
7   wrong, that you had access to the e-mails for a while
8   and that's how you took the screen shots.
9      A.   So on Apple -- Apple e-mail, your e-mail stays
10  on your phone as long as it is opened until you remove
11  that account.
12     Q.   And so you had not removed that account?
13     A.   I removed that account when I got fired.
14  Shortly after I got fired.   I don't know the exact date.
15     Q.   So you took screenshots after you were accused
16  of unauthorized use of marketing funds?
17     A.   After -- yeah, I believe so.
18     Q.   And when were you accused of that?
19     A.   I don't remember.
20     Q.   How did you find out were you accused of that?
21     A.   I received a letter, either from you or Mr.
22  Clark.
23     Q.   Okay.   Was it after the lawsuit was filed?
24     A.   I don't remember.
25     Q.   It was after April 13th; correct?

Ernest Kim Vol 1
December 18, 2020
190

1       A.   I think so.

2       Q.   Okay.  So sometime after April 13th, you still

3   had access to those e-mails?

4       A.   Access through Gmail?  No.

5       Q.   You had access to them on your phone?

6       A.   Yes.

7       Q.   Okay.  So you were not able to mail the

8   property back because of the quarantine order?

9       A.   Yes.

10       Q.   But you did anyway.

11       A.   Because they threatened to take legal action

12   according to that letter.

13       Q.   Did you -- after you were notified that you

14   were terminated, did you go on to the MacBook?

15       A.   Yes.

16       Q.   And what did you do on the MacBook?

17       A.   I wanted to remove or de-link my Apple ID from

18   the laptop.

19       Q.   Did you do that?

20       A.   I couldn't figure it out.

21       Q.   Okay.  What about the documents that were

22   maintained on that laptop?  Did you make a copy of

23   those?

24       A.   No.  I think I told you earlier that all the

25   documents are on the Cloud.

Ernest Kim Vol 1
December 18, 2020                                          192

1   laptop?

2        A.   What do you mean by link to the e-mail?

3        Q.   Did you delete -- did you reset the computer?

4        A.   Yes.

5        Q.   Okay.   Factory reset?

6        A.   Yes.

7        Q.   Okay.   Why did you do that?

8        A.   I couldn't unlink my Apple ID to the laptop.

9        Q.   Did you contact anyone at Giddy asking how to

10   do that?

11       A.   No.

12       Q.   You understood by resetting the computer would

13   lose all the information that was on there, right?

14            MR. ERICK:  Objection.  Form.

15            THE WITNESS:  There is no information

16   physically on the laptop.  All the work we do are on the

17   Cloud.

18       Q.   (BY MR. STOKER) Did you contact Giddy to ask if

19   you should to reset the computer?

20       A.   No.

21       Q.   How did you figure out how to reset the

22   computer?

23       A.   I looked it up on YouTube.  Google first.

24       Q.   And what did you do to reset it?

25       A.   I don't have the exact process.  They said you

Ernest Kim Vol 1
December 18, 2020                                        197

1              MR. STOKER:  Sure.  Let's just do it now.

2              MR. ERICK:  What's that?

3              MR. STOKER:  We'll just do it now.

4              MR. ERICK:  Okay, Great.  All right, thank

5  you.  Let's do a five minute.

6              MR. STOKER:  Five- ten minute.  Sure.

7              MR. ERICK:  Great.  Thank you.

8              THE VIDEOGRAPHER:  We are off the record at

9  8:14 p.m. GMT -- 2:14 p.m. CST.

10             (Break taken from 2:14 p.m. to 2:42 p.m.)

11             THE VIDEOGRAPHER:  Okay we are on the

12 record at 8:42 p.m., GMT -- 2:42 p.m., CST.

13     Q.  (BY MR. STOKER)  Are you prepared to continue

14 with your deposition, Mr. Kim?

15     A.  Yes.

16     Q.  Do you understand you're still under oath?

17     A.  Yes.

18     Q.  Did you understand when you were employed with

19 Giddy that it relied on investors?

20     A.  A little bit, yes.

21     Q.  You were made aware that they were investors?

22     A.  Yes.

23     Q.  Were you ever provided a list of investors?

24     A.  Some.

25     Q.  Some.  Were you provided names of particular

Ernest Kim Vol 1
December 18, 2020                                198

1   investors?

2        A.   There were a couple names, yes.

3        Q.   Okay.  And were you, as part of your marketing

4   efforts, directed to contact the potential investors?

5        A.   Potential investors?

6        Q.   Yes.

7        A.   No.

8        Q.   I want to go back to Exhibit 12 for just a

9   second.

10       A.   Okay.

11       Q.   You have seen this before and we talked about

12  your response.  And in the first sentence of -- I guess

13  it's the second sentence, you mentioned a wrongful

14  termination?

15       A.   Yes.

16       Q.   Do you see that?  Did you believe you were

17  terminated at that time?

18       A.   Because -- no -- what I found out was -- my --

19  I didn't have access to anything -- to the company.

20       Q.   It was your -- when you put wrongful

21  termination -- do you believe that you no longer had a

22  job with Giddy?

23       A.   Based on my assumption, yes.

24       Q.   So on your laptop that was reset after your

25  employment, you said that there's nothing on the hard

Ernest Kim Vol 1
December 18, 2020                                         205

1        A.   Somebody who's reading it?  They wouldn't know.

2        Q.   That's not what I asked.  Were you referring to

3   one of those in this tweet?

4        A.   Possibly.

5        Q.   What company were you referring to?

6        A.   I didn't name names.  So they were -- I wasn't

7   referring to one specific company.

8        Q.   Okay.  Let's do it this way.  What start-up

9   company do you know that allegedly pitched Mark Cuban

10  that you have information about who forced employees to

11  come to work despite the shelter-in-place order?

12       A.   One of them?  Giddy.

13       Q.   Okay.  Is it fair to say now, with that extra

14  information, that this was referring to Giddy?

15       A.   But I did not names.

16       Q.   I'm not asking you that.  I'm saying what you

17  were referring to.

18       A.   Possibly.

19       Q.   Okay.  If Mark Cuban had responded, what story

20  would you have been telling him?

21       A.   He didn't respond.

22            MR. ERICK:  Hold on.  Objection.  Form.

23  Calls for speculation.

24       Q.   (BY MR. STOKER)  It says, "Now that an employee

25  might have the virus; waiting for his test result."

1          Who were you referring to there?

2     A.   Where do you see that?

3     Q.   In the third line of the tweet to Mark Cuban.

4     A.   I didn't name the name of employee.

5     Q.   What are you referring to when you say, "an

6  employee might have the virus waiting for his test

7  result."

8     A.   Possibly me.

9     Q.   Okay.  And you were waiting for a test result

10 at this time, correct?

11    A.   Yes.

12    Q.   Okay.  "CEO is now threatening to sue him."

13          Do you see that?

14    A.   Yes.

15    Q.   And who are you referring to?  Yourself there.

16    A.   Yes.

17    Q.   All right.

18          This is Raven Ambers.  You're interested in

19 covering a story that involves racial discrimination,

20 fraud to secure more money for PPP and much more in one

21 single story.  What are you referring to there?

22    A.   Possibly Giddy.

23    Q.   Possibly anybody else?

24    A.   None that I can think of.

25    Q.   Erin Burnett.  You have similar accusations,

Ernest Kim Vol 1
December 18, 2020                                    207

1   although this does not have a date.  Who are you

2   referring to here?

3        A.  Giddy.

4        Q.  And, again, it says wrongful termination.  Is

5   that because you felt you were terminated at the time?

6        A.  Yes.

7        Q.  Okay.  MettaWorld37 -- who is that?

8        A.  I don't know.

9        Q.  Is that a basketball player?

10       A.  Oh, yeah; maybe.  Potentially, yes.

11       Q.  Formerly known as Ron Artest.

12       A.  Oh, I don't know his performer name.  He's --

13       Q.  Were you aware that he had some investment in

14   Giddy?

15       A.  I've been told but his wife did.

16       Q.  Okay.  And you say they're here to pull a fraud

17   in a company.  Do you have some information related to

18   that allegation in this tweet?

19       A.  Yes, I do.

20       Q.  What is that?

21       A.  That Jacobson fudged numbers on PPP loans, you

22   know, to secure more money.

23       Q.  It says, using your name.  Did he use Metta

24   World's name?  Are you claiming he used this

25   individual's name?

Ernest Kim Vol 1
December 18, 2020

208

1      A.  No.

2      Q.  To pull a fraud?

3      A.  No.

4      Q.  Okay.  It's phrased that way but that's not --

5      A.  Oh, that -- actually that, I don't know.  I

6  don't know what this phrase was or how I constructed

7  this.

8      Q.  Okay.  And Ozzy_Statesman -- an interesting

9  story to report.

10     A.  Yes.

11     Q.  Is there something you're referring to there?

12     A.  Giddy.

13     Q.  Okay.  And you never had any dialogue with any

14 of these people?

15     A.  No.  And I've been instructed to remove them so

16 I did.

17     Q.  And so this is Exhibit 16 in front of you and a

18 bring this up -- please take a second and read it, but I

19 believe this may be what you're referring to you were

20 instructed to remove it.

21             (Exhibit No. 16 marked.)

22     A.  Yes.

23     Q.  Okay.  So once you received this letter --

24 well, first of all, do you recognize this letter?

25     A.  Yes.

Ernest Kim Vol 1
December 18, 2020                                    209

1      Q.  And once you received it, you took the tweets

2   down?

3      A.  Yes.

4      Q.  Why did you take them down after this letter?

5      A.  I mean, I didn't want to get a lawsuit.

6              MR. STOKER:  On the screen now is a

7   document labeled Exhibit 17.  Do you see that?

8              (Exhibit No. 17 marked.)

9      A.  Yes.

10     Q.  (BY MR. STOKER)  Do you recognize this

11  document?

12     A.  I don't remember.

13     Q.  You don't recall receiving this?

14     A.  I don't remember; it's eight months ago; I

15  don't remember if I got this or not.

16     Q.  You don't recall responding to it?

17     A.  I don't recall.

18     Q.  Do you recall when you received your COVID test

19  results from early April?

20     A.  Yeah, I getting a -- yeah, I remember a --

21  yeah, I remember.

22     Q.  Do you remember what the date was?

23     A.  No, I don't.

24     Q.  Do you remember sharing it with Giddy?

25     A.  No.