| EXHIBIT C | UNITED STATES DISTRICT COURT<br>WESTERN DISTRICT OF TEXAS<br>AUSTIN DIVISION |
|---|---|

| | | |
|---|---|---|
| GIDDY HOLDINGS, INC. | § § § | |
| PLAINTIFF, | § § | |
| VS. | § § | Civil Action No. 1:20-cv-00434-LY |
| ERNEST KIM | § § § | |
| DEFENDANT. | § | |

## DECLARATION OF BRETT JACOBSON

BEFORE ME, the undersigned notary, on this day personally appeared Brett Jacobson, known to me to be the person whose name is subscribed below, who after being first duly sworn, deposed and stated:

1. My name is Brett Jacobson. I am over 21 years old, am of sound mind, and am capable of making this affidavit.

2. The facts stated within this affidavit are within my personal knowledge and are true and correct. .

3. I am the Chief Executive Officer and founder of Giddy Holdings, Inc. Giddy is a medical device company started in 2019 to sell, among other things, FDA-Registered Class II medical devices treating erectile dysfunction.

4. In early 2020, Giddy was growing quickly and I identified a need for a dedicated Chief Marketing Office to help manage Giddy's growth. Giddy needed an experienced marketing professional who had worked with large companies in the past, knew how to create partnerships, knew how to build and effectively manage brands, could review and assess existing plans to develop new strategies and lead a team of other marketing employees.

5.     Defendant Ernest Kim applied for the job of Chief Marketing Officer ("CMO") and submitted the resume attached hereto as Exhibit BJ-1. I first interviewed Mr. Kim on the phone and then again in person. Based on his representations to me in those interviews, and from his resume, Giddy offered Mr. Kim the job of CMO on February 17, 2020. A true and correct copy of the offer letter is attached hereto as Exhibit BJ-2.

6.     Mr. Kim joined Giddy as its CMO on March 2, 2020. As part of his new employee onboarding, Mr. Kim signed a Giddy employment handbook and received Giddy office keys, computer, charging cord and carrying case. A true and correct copy of the new hire checklist and employee handbook is attached hereto as Exhibit BJ-3. The employee handbook signed by Mr. Kim contains several post-employment provisions, including confidentiality, non-disclosure and non-disparagement provisions. Exhibit BJ-3.

7.     Also in his role as CMO, Mr. Kim was given extensive access to and responsibility for several activities to facilitate Giddy's legitimate business efforts: (i) managing Giddy's existing marketing efforts and plans, (ii) enacting new and creative marketing plans, (iii) directly overseeing Giddy's communication and public relations efforts, (iv) overseeing Giddy's database of current customer contact information, and (v) managing Giddy's marketing team. Mr. Kim was also given extensive access to Giddy's detailed financial and operational information, including the identities of high level donors and investors.

8.     The information given to Mr. Kim, including marketing plans, pricing forecasts, and financial modeling with significant time and effort. I know this because in my role as CEO and Founder, I was intimately involved in the development of this information and have personal knowledge of the time, effort, and skill it took to develop.

9. On April 3, 2020, in the nascence of the Coronavirus pandemic, Mr. Kim entered my office and explained to Mr. Jacobson that he was experiencing symptoms analogous to known coronavirus symptoms and that he needed to depart immediately. Mr. Kim explicitly told me that his symptoms had only just begun occurring. Upon his departure, however, Mr. Kim posted on Slack – the company-wide messaging platform – that he had had a "Body ache, headache and fever since 4:50am this morning." This naturally sent everyone in our office into a tailspin.

10. In an attempt to calm everyone down and out of concern for Mr. Kim's wellbeing, we requested he seek immediate medical attention and to not return to the office without a doctor's note evidencing his lack of COVID-19. In response, Mr. Kim accused Giddy of wrongfully terminating hi, retaliation, and discrimination – all of which were untrue.

11. On April 6, 2020, I discovered that Mr. Kim had been posting messages on the social media platform Twitter about Giddy. A true and correct copy of these messages is attached as Exhibit BJ-4. Not only was Mr. Kim spreading false and defamatory information about Giddy, he was directly targeting Giddy investors on Twitter in an attempt to spread this misinformation. The only way he would have known to "tweet" at Giddy investors was through the knowledge he gained as a Giddy employee.

12. After discovering these tweets on April 6, 2020, Giddy notified Mr. Kim that he was terminated, effective immediately. A true and correct copy of this correspondence is attached as Exhibit BJ-5. As part of this notification, Mr. Kim was reminded of his post-employment obligations, as well as Giddy's demand for a return of all company property, including his laptop. Giddy requested return of all company property within three days. Mr. Kim did not comply and refused to return Giddy's property upon demand for more than a week.

13. When Mr. Kim did finally return Giddy's property, we discovered that it had accessed without authorization and all information deleted. All of the files, documents, folders, and emails – including Giddy's marketing data, reports, financial information, sales data, and trend analyses – had been deleted from the laptop and the cloud based document system and shared drives used by all Giddy employees.

14. I know this because in my role as CEO and Founder of Giddy, I had personal knowledge of what files Mr. Kim had access to during his employment. Those files were deleted and unable to be recovered, from both Mr. Kim's Giddy-owned laptop and from the cloud-based and shared drives used by Giddy. The data that Mr. Kim destroyed by deletion was worth hundreds of thousands of dollars, and cost Giddy over $200,000 to recreate.

15. Mr. Kim also deleted all files related to contracts he entered into on behalf of Giddy without authorization. Giddy only realized (or realizes, as the reach of Mr. Kim's actions is unknown) that the contracts exist when vendors contact Giddy demanding payment. Giddy has had several accounts go into collections on account of contracts that Mr. Kim entered into without authorization, and then deleted all evidence of, after he was terminated. The extent of Mr. Kim's damages to Giddy are discovered almost daily.

16. The total cost to Giddy directly resulting from Mr. Kim's unauthorized access of Giddy's computer systems, including deleting and destroying data, is currently estimated to be $1.2 million dollars. The exact number cannot be determined as the damages continue to grow and Giddy discovers additional data that Mr. Kim destroyed. This number is based on the cost to recreate the deleted data, re-run advertisements, recreate analytics, and terminate contracts entered into by Mr. Kim.

17. The damage done to Giddy by Mr. Kim does not stop with his unauthorized access to Giddy's computers and deleting and destroying Giddy's data. The tweets that Mr. Kim posted were seen by thousands of people, including Giddy investors. I know this because multiple potential and current Giddy investors reached out to me personally. Giddy lost investments that were pending as a direct result of Mr. Kim's tweets. The amount of investment lost as a result of Mr. Kim's false and defamatory statements is at least $300,000.

18. The sudden drop in promised funds from investors, in the midst of a pandemic, caused an unexpected deficit in liquidated funds and an inability for Giddy to make payroll.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 11, 2021 in Austin, Texas.

DocuSigned by:

*Brett Jacobson*
41B91C63F49C4B6...

Brett Jacobson