**EXHIBIT BJ-1**



# Ernie Kim
## Marketing Transformation Executive

20+ years of management consulting and advertising agency experience specializing in tech, data and analytics-driven marketing transformation



☐m ✉

☐ ☐

6510 Kathleen Court, Garland TX 75044 ⚲

linkedin.com/in/erniekim 🔗

---

## WORK EXPERIENCE

### Global Head of Internal Consulting (retired)
General Motors

*03/2018 – 02/2019*                                    *Detroit, MI*

*Tasks/Achievements*
- Leading $1.7B in value creation through enterprise transformations including marketing and sales

### Chief Marketing Officer (part-time)
Leadz (A Martech Startup)

*01/2017 – 12/2017*                                    *Dallas, TX*

*Achievements/Tasks*
- Responsible for both user and advertiser acquisition
- Co-lead raising funds

### Managing Partner, Marketing Transformation
KPM & Company (acquired)

*01/2017 – 02/2018*                          *Dallas, TX / Johannesburg, RSA*

*Spun off from Booz & Company after PwC acquisition*

*Achievements/Tasks*
- Manage marketing transformation practice globally
- Responsible for North America and APAC

### Principal - Marketing Transformation
Booz & Company (acquired by PwC)

*04/2015 – 02/2018*                                    *Dallas, TX*

*Tasks/Achievements*
- Led and grew marketing transformation practice through client and intellectual property development
- Developed market-leading marketing transformation practice and grew to $xx mil

### Head of ASEAN Products Sales & Marketing (CRM) Transformation / Head of ASEAN Retail Practice
Accenture

*03/2011 – 01/2015*                                *Singapore, Singapore*

*Tasks/Achievements*
- Took over a declining ASEAN retail practice and grew at an annualized rate of 49%
- Started ASEAN Products OG CRM Transformation practice and grew to $xxx mil practice
- Managed 6 countries: Singapore, Indonesia, Malaysia, Thailand, Vietnam and the Philippines.

### Notable Previous Roles
<>

*05/1999 – 03/2011*                                    *Various Positions*

- Senior Vice President/Chief Analytics Officer, MMA (Marketing Management Analytics)
- Vice President (Strategic Business Analysis)/ Director (Strategy & Analytics): Omnicom (Targetbase / Interbrand)
- Associate Director - Director, Data Strategy and Insights: GroupM, a WPP company
- Consultant - Senior Associate: Booz Allen Hamilton

## SKILLS & COMPETENCIES

`Brand Strategy`  `Marketing Analytics`  `B2B / B2C`

`Branded Customer Experience`  `Consumer Insights`

`CRM`  `Marketing & Sales Integration`  `Digital Strategy`

`Marketing Automation`

## ACHIEVEMENTS

Helped clients reach $7b, $2.4b, $1.1b and $0.9b revenue from $3.8b, $0.6b, $0.3b and $0.1b respectively

$61m, $77m, $136m and $255m improvements in operating efficiencies

$44m, $80m and $132m cost reductions through marketing transformations

46%, 53% and 171% increase in market share through brand strategy-led enterprise transformation

16 clients with successful turn-arounds brands

57 clients achieved top-line / bottom-line targets

49 successful transformation projects

Interim Chief Marketing Officer for a $1b client (2017)

Interim Chief Marketing Officer for a $3.8b client (2015)

Interim Head of Marketing for a $3.3b client (2013)

Interim Head of Marketing Analytics for a $2.2b client (2012)

## LANGUAGES

| | |
|---|---|
| **English**<br>*Fluent* | **Spanish**<br>*Beginner* |
| **Indonesian Bahasa**<br>*Beginner* | **Korean**<br>*Fluent* |

## EDUCATION

MA/PhD (ABD) , Economics (Health Economics, Applied Econometrics and International Economics), City University of New York - Graduate Center (PhD Consortium with Columbia University, Fordham University, NYU, and New School) - 05/2005

BA, Economics, Rutgers University (Full Scholarship) - 05/1999

<div style="border: 1px solid;">

**EXHIBIT**
**BJ-2**

</div>



February 17, 2020

Ernie Kim
Via Email
Erniekim@gmail.com

Dear Ernie,

**Congratulations!** Giddy Holdings, Inc. ("Giddy") is pleased to offer you the position of Chief Marketing Officer, a full-time position based in our Austin office. This letter will set forth the details of your employment with Giddy. Please read it carefully, and sign and date below.

**1.      Salary and Reporting**

In your role, you will be reporting directly to Brett Jacobson, CEO (unless or until Giddy's reporting structure changes). Your start date will be on or before Monday, March 2, 2020.  You will receive an annual salary of $200,000, paid bi-weekly, every other Friday, in the amount of $7,692.30 as earned, less applicable tax withholding and paid in accordance with Giddy's normal payroll procedures.

**2.      Bonus**

In addition to your base compensation, employees in good standing will receive a quarterly bonus ("Quarterly Bonus") equal to 0.4% of Giddy's gross revenue minus the direct cost of goods and shipping. A Quarterly Bonus will be paid along with your second March paycheck, based on sales revenue from December 1st through February 28th. Another Quarterly Bonus will be paid along with your second June paycheck, based on sales revenue from March 1st through May 31st. Another Quarterly Bonus will be paid along with your second September paycheck, based on sales revenue from June 1st to August 31st. A final Quarterly Bonus will be paid along with your second December paycheck, based on sales revenue from September 1st through November 30th. Additionally, you will receive an annual bonus ("Annual Bonus") equal to 0.4% of Giddy's gross revenue minus the direct cost of goods and shipping. The Annual Bonus will be paid along with your first January paycheck. In calculating any Quarterly or Annual Bonuses, revenue will be determined based on funds received by Giddy, which have cleared our company bank account.

A few further notes regarding Bonuses: (1) Employee will be eligible for bonuses the first day of work. Should the Employee fail to begin work the Company will not be eligible for any Bonus. (2) If your employment is terminated by Giddy, you will remain eligible for a Quarterly Bonus for that particular Quarter during which your employment was ended, so long as the payment date of the Quarterly Bonus for which you are eligible (see the paragraph above) is within 45 calendar days of the date of your termination (the "Grace Period"). (3) If your employment is

KIM 027 of 046



terminated by Giddy, you will remain eligible for an Annual Bonus for the year during which your employment

was ended, so long as the payment date of the Annual Bonus for which you are eligible is within 45 calendar days of the date of your termination (the "Grace Period").

Finally, in the event Giddy is acquired while you are employed by the Company, you will receive a 0.4% Acquisition Bonus based on the purchase price of the Company minus any outstanding debt. This Acquisition Bonus will be paid out by Giddy within fifteen (15) days of receipt of funds (the "Payment Date"). If you terminate your employment with Giddy, or your employment is terminated by Giddy, you will remain eligible for an Acquisition Bonus, so long as (1) the Acquisition agreement was executed prior to you terminating your employment with Giddy or your employment being terminated by Giddy, and (2) the payment date of the Acquisition Bonus is within 30 calendar days of the date of your termination (the "Grace Period").

**3.       Benefits**

The details and stipulations of all of Giddy's benefits can be found in the Company Handbook, which you will be provided once your employment begins. Please read these materials carefully as the list below is intended only as a brief outline. As a regular full-time employee, you are entitled to the following benefits. For more information, please consult Human Resources.

- Paid Time Off – Total of up to 20 Days Per Year
  - Six (6) paid holidays
  - Two (2) paid floating holidays
  - Up to twelve (12) paid Personal Time Off (PTO) days, which are earned ratably per pay period. PTO accruals begin upon hire and can be used once accrued.
  - Employee will be able to take off 5 business days in April which will not be deducted from his PTO.

- Medical and dental insurance becomes effective the first day of the month following the first full calendar month of employment.  Giddy covers 100% of the base Silver PPO Plan for the employee, their spouse and dependents. Employees may elect to buy a different plan, and additional premiums will be deducted from their paychecks on a pre-tax basis.

- Gym Membership – Up to $100 per month maximum for the employee only.

An example of your annualized compensation, less applicable tax withholding and waiting periods, is outlined below:



| | |
|---|---|
| Annualized Salary: | $200,000 |
| Annualized Healthcare Contribution* | $17,100 ($475 per employee, $475 per spouse and $475 for 1 to 9 children per month |
| Projected Q2, Q3 & Q4 2020 and Q1 2021 Annualized Quarterly Bonuses* | $1,191,976 |
| Accrued Annual Bonuses aforementioned Quarters* | $1,191,976 |

| | |
|---|---|
| Total: | $2,601,052* |

*The aforementioned calculation represent an estimate and not guaranteed.

## 4.      At-Will Employment

Your employment here is "at-will" which means that either you or Giddy may terminate the employment relationship at any time and for any reason whatsoever, so long as it is not prohibited by law. Additionally, the terms of your employment may be modified with or without cause or prior notice, including your title, compensation, benefits and/or reporting structure, as well as Giddy's personnel policies and procedures.  The "at will" nature of your employment may only be changed in a document signed by both Brett Jacobson, CEO, and you.

All new employees at Giddy are subject to an introductory period of 90 days. During this period, you will have the opportunity to learn about the position and the company. Likewise, Giddy will use this period to determine whether or not you are a good fit for the position. Introductory periods may be extended for legitimate business reasons, performance reasons, or because of approved absences taken by you during the period. Please note that during the introductory period, as well as the entire course of your employment, you will be an at-will employee, so employment is not guaranteed for either the entire 90 days of the introductory period or any period thereafter.

## 5.      General

Like all of Giddy's employees, you will be required to sign your new hire paperwork within 72 hours of the beginning date of your employment. Our offer is contingent upon receipt of documentary evidence of your identity and eligibility to work in the United States, as well as the completion of a satisfactory reference check. Otherwise, our employment relationship with you



may be terminated. You will also be required to complete an I-9 form and provide the appropriate identification necessary to complete the form.  Attached is a list of acceptable

documents.  You will need to bring an item from list A, or one item from list B AND C on your first day. If you do not bring in proper identification, you will not be able to work.

Please confirm your acceptance of these terms by returning a signed copy of this letter to Human Resources by the close of business on Tuesday, February 18, 2020.  An original will be provided as part of your new hire paperwork.  This letter, along with your new hire paperwork, sets forth the terms of your employment with Giddy.  Therefore, this agreement supersedes any prior representations or agreements between you and Giddy, whether written or oral.  This agreement may not be modified or amended except by a written agreement signed by Brett Jacobson, CEO, and you.

If you have any Human Resources questions, please call Human Resources at 512.856.5509.

We are very excited about the prospect of you joining our team, and we look forward to the addition of your professionalism and experience to help Giddy achieve its goals.

Very truly yours,

DocuSigned by:

*Brett Jacobson*

41B91C63F49C4B6...

Brett Jacobson
CEO
Giddy Holdings, Inc.

Agreed:  DocuSigned by: *Ernie Kim*
                 E1...Ernie Kim

Date:  2/20/2020



## LISTS OF ACCEPTABLE DOCUMENTS
### All documents must be UNEXPIRED

Employees may present one selection from List A
or a combination of one selection from List B and one selection from List C.

| LIST A<br>Documents that Establish<br>Both Identity and<br>Employment Authorization | OR | LIST B<br>Documents that Establish<br>Identity | AND | LIST C<br>Documents that Establish<br>Employment Authorization |
|---|---|---|---|---|
| 1. U.S. Passport or U.S. Passport Card | | 1. Driver's license or ID card issued by a State or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, gender, height, eye color, and address | | 1. A Social Security Account Number card, unless the card includes one of the following restrictions:<br>(1) NOT VALID FOR EMPLOYMENT<br>(2) VALID FOR WORK ONLY WITH INS AUTHORIZATION<br>(3) VALID FOR WORK ONLY WITH DHS AUTHORIZATION |
| 2. Permanent Resident Card or Alien Registration Receipt Card (Form I-551) | | | | |
| 3. Foreign passport that contains a temporary I-551 stamp or temporary I-551 printed notation on a machine-readable immigrant visa | | 2. ID card issued by federal, state or local government agencies or entities, provided it contains a photograph or information such as name, date of birth, gender, height, eye color, and address | | 2. Certification of report of birth issued by the Department of State (Forms DS-1350, FS-545, FS-240) |
| 4. Employment Authorization Document that contains a photograph (Form I-766) | | 3. School ID card with a photograph | | 3. Original or certified copy of birth certificate issued by a State, county, municipal authority, or territory of the United States bearing an official seal |
| 5. For a nonimmigrant alien authorized to work for a specific employer because of his or her status:<br>a. Foreign passport; and<br>b. Form I-94 or Form I-94A that has the following:<br>(1) The same name as the passport; and<br>(2) An endorsement of the alien's nonimmigrant status as long as that period of endorsement has not yet expired and the proposed employment is not in conflict with any restrictions or limitations identified on the form. | | 4. Voter's registration card | | |
| | | 5. U.S. Military card or draft record | | 4. Native American tribal document |
| | | 6. Military dependent's ID card | | 5. U.S. Citizen ID Card (Form I-197) |
| | | 7. U.S. Coast Guard Merchant Mariner Card | | 6. Identification Card for Use of Resident Citizen in the United States (Form I-179) |
| | | 8. Native American tribal document | | |
| | | 9. Driver's license issued by a Canadian government authority | | 7. Employment authorization document issued by the Department of Homeland Security |
| 6. Passport from the Federated States of Micronesia (FSM) or the Republic of the Marshall Islands (RMI) with Form I-94 or Form I-94A indicating nonimmigrant admission under the Compact of Free Association Between the United States and the FSM or RMI | | **For persons under age 18 who are unable to present a document listed above:**<br>10. School record or report card<br>11. Clinic, doctor, or hospital record<br>12. Day-care or nursery school record | | |

**Examples of many of these documents appear in Part 13 of the Handbook for Employers (M-274).**

**Refer to the instructions for more information about acceptable receipts.**

Giddy Holdings, Inc.
1114 East Cesar Chavez Street Austin, TX 78702
512.952.0440

KIM 031 of 046

**Giddy**

# AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT, AND ARBITRATION AGREEMENT

As a condition of my employment with Giddy Holdings, Inc. (the "**Company**"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following provisions of this At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (this "**Agreement**"):

## 1.    AT-WILL EMPLOYMENT

I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR NO SPECIFIED TERM AND CONSTITUTES "AT-WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE PRESIDENT OR CEO OF THE COMPANY. ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE COMPANY, WITH OR WITHOUT NOTICE. I FURTHER ACKNOWLEDGE THAT THE COMPANY MAY MODIFY JOB TITLES, SALARIES, AND BENEFITS FROM TIME TO TIME AS IT DEEMS NECESSARY.

## 2.    CONFIDENTIALITY

A.    *Definition of Company Confidential Information*. I understand that "**Company Confidential Information**" means information (including any and all combinations of individual items of information) that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with the Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of the Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, discoveries, ideas, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property. Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish (i) was publicly known or made generally available prior to the time of disclosure by the Company to me; (ii) becomes publicly known or made generally available after disclosure by the Company to me through no wrongful action or omission by me; or (iii) is in my rightful possession, without confidentiality

obligations, at the time of disclosure by the Company as shown by my then-contemporaneous written records; provided that any combination of individual items of information shall not be deemed to be within any of the foregoing exceptions merely because one or more of the individual items are within such exception, unless the combination as a whole is within such exception. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

B.  *Nonuse and Nondisclosure*. I agree that during and after my employment with the Company, I will hold in the strictest confidence and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information. I will not (i) use Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose Company Confidential Information to any third party without the prior written authorization of the President, CEO, or the Board of Directors of the Company. Prior to disclosure, when compelled by applicable law, I shall provide prior written notice to the President, CEO, and General Counsel of the Company (as applicable). I agree that I obtain no title to any Company Confidential Information, and that the Company retains all Confidential Information as the sole property of the Company. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including, immediate termination and legal action by the Company. I understand that my obligations under this Section shall continue after termination of my employment and also that nothing in this Agreement prevents me from engaging in protected activity, as described in Section 14 below.

C.  *Former Employer Confidential Information*. I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity with which I have an obligation to keep such proprietary information or trade secrets in confidence. I further agree that I will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such third party unless disclosure to, and use by, the Company has been consented to, in writing, by such third party and the Company.

D.  *Third Party Information*. I recognize that the Company has received, and in the future may receive, from third parties (for example, customers, suppliers, licensors, licensees, partners, and collaborators) as well as its subsidiaries and affiliates ("**Associated Third Parties**"), information which the Company is required to maintain and treat as confidential or proprietary information of such Associated Third Parties ("**Associated Third Party Confidential Information**"), and I agree to use such Associated Third Party Confidential Information only as directed by the Company and to not use or disclose such Associated Third Party Confidential Information in a manner that would violate the Company's obligations to such Associated Third Parties. By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with the Company and thereafter, that I owe the Company and its Associated Third Parties a duty to hold all such Associated Third Party Confidential Information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the

-2-

Company's agreement with such Associated Third Parties. I further agree to comply with any and all Company policies and guidelines that may be adopted from time to time regarding Associated Third Parties and Associated Third Party Confidential Information. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any Company policies during my employment may lead to disciplinary action, up to and including, immediate termination and legal action by the Company.

E.  *Non disparagement*. I agree to refrain, both during and after my employment, from publishing any oral or written statements about the Company or any of the Company's equity holders, members, shareholders, managers, officers, employees, consultants, agents or representatives that (i) are slanderous, libelous or defamatory; or (ii) place the Company or any of the Company's equity holders, members, shareholders, managers, officers, employees, consultants, agents or representatives in a false light before the public. A violation or threatened violation of this prohibition may be enjoyed by the courts. The rights afforded the Company under this provision are in addition to any and all rights and remedies otherwise afforded by law.

## 3.  OWNERSHIP

A.  *Assignment of Inventions*. As between the Company and myself, I agree that all right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, logos, inventions, improvements, developments, discoveries, ideas and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by me, solely or in collaboration with others, during the period of time I am in the employ of the Company (including during my off-duty hours), or with the use of Company's equipment, supplies, facilities, or Company Confidential Information, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing, except as provided in Section 3.G below (collectively, "**Inventions**"), are the sole property of the Company. I also agree to promptly make full written disclosure to the Company of any Inventions, and to deliver and assign and hereby irrevocably assign fully to the Company all of my right, title and interest in and to Inventions. I agree that this assignment includes a present conveyance to the Company of ownership of Inventions that are not yet in existence. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit, and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions.

B.  *Pre-Existing Materials*. I will inform the Company, in writing, before incorporating any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by me or in which I have an interest prior to, or separate from, my employment with the Company, including, without limitation, any inventions that qualify as an "Other Invention" as defined below in Section 3.G. ("**Prior Inventions**") into any Invention or otherwise utilizing any Prior Invention in the course of my employment with the Company; and the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and

-3-

Giddy-00033

authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such incorporated or utilized Prior Inventions, without restriction, including, without limitation, as part of, or in connection with, such Invention, and to practice any method related thereto. I will not incorporate any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third party into any Invention without the Company's prior written permission. I have attached hereto as Exhibit A a list describing all Prior Inventions that relate to the Company's current or anticipated business, products, or research and development or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that if any Prior Inventions are included on Exhibit A, they will not materially affect my ability to perform all obligations under this Agreement.

C.  *Moral Rights.* Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "**Moral Rights**"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

D.  *Maintenance of Records.* I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company. As between the Company and myself, the records are and will be available to and remain the sole property of the Company at all times.

E.  *Further Assurances.* I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments that the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to all Inventions, and testifying in a suit or other proceeding relating to such Inventions. I further agree that my obligations under this Section shall continue after the termination of this Agreement.

F.  *Attorney-in-Fact.* I agree that, if the Company is unable because of my unavailability, mental or physical incapacity, or for any other reason to secure my signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to the Company in Section 3.A., then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf to execute and file any papers and oaths, and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents,

Giddy-00034

copyright and mask work registrations with the same legal force and effect as if executed by me. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

G. *Exception to Assignments*. I UNDERSTAND THAT THE PROVISIONS OF THIS AGREEMENT REQUIRING ASSIGNMENT OF INVENTIONS (AS DEFINED UNDER SECTION 3.A. ABOVE) TO THE COMPANY DO NOT APPLY TO ANY INVENTION FOR WHICH NO EQUIPMENT SUPPLIES, FACILITY, OR TRADE SECRET INFORMATION OF THE COMPANY WAS USED AND WHICH WAS DEVELOPED ENTIRELY ON MY OWN TIME (AN "**OTHER INVENTION**"), INCLUDING AS REQUIRED PURSUANT TO REVISED CODE OF WASHINGTON SECTION 49.44.140, CALIFORNIA LABOR CODE 2870, OR ANY OTHER EQUIVALENT STATE STATUTE, IF APPLICABLE, EXCEPT FOR THOSE OTHER INVENTIONS THAT RELATE: (A) DIRECTLY TO THE BUSINESS OF COMPANY; (B) TO COMPANY'S ACTUAL OR DEMONSTRABLY ANTICIPATED RESEARCH OR DEVELOPMENT; OR (C) RESULT FROM ANY WORK I PERFORM FOR COMPANY. I WILL NOT INCORPORATE, OR PERMIT TO BE INCORPORATED, ANY OTHER INVENTION OWNED BY ME OR IN WHICH I HAVE AN INTEREST INTO A COMPANY PRODUCT, PROCESS OR SERVICE WITHOUT COMPANY'S PRIOR WRITTEN CONSENT.

I WILL ADVISE THE COMPANY PROMPTLY IN WRITING OF ANY INVENTIONS THAT I BELIEVE MEET THE ABOVE CRITERIA AND ARE NOT OTHERWISE DISCLOSED ON EXHIBIT A TO PERMIT A DETERMINATION OF OWNERSHIP BY THE COMPANY. ANY SUCH DISCLOSURE WILL BE RECEIVED IN CONFIDENCE.

### 4. CONFLICTING OBLIGATIONS

A. *Current Obligations.* I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company.

B. *Prior Relationships*. Without limiting Section 4.A. I represent and warrant that I have no other agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, my obligations to the Company under this Agreement, or my ability to become employed and perform the services for which I am being hired by the Company. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices, and documents), I have returned all property and confidential information belonging to all prior employers (and/or other third parties I have performed services for in accordance with the terms of my applicable agreement). Moreover, I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corporations, and assigns for all verdicts, judgments, settlements, and other losses incurred by any of them resulting from my breach of my obligations under any agreement with a third party to which I

Giddy-00035

am a party or obligation to which I am bound, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action, except as prohibited by law.

### 5.   RETURN OF COMPANY MATERIALS

A.  *Definition of Electronic Media Equipment and Electronic Media Systems. I* understand that **"Electronic Media Equipment"** includes, but is not limited to, computers, external storage devices, thumb drives, mobile devices (including, but not limited to, smart phones, tablets, and e-readers), telephone equipment, and other electronic media devices. I understand that **"Electronic Media Systems"** includes, but is not limited to, computer servers, messaging and email systems or accounts, applications for computers or mobile devices, and web-based services (including cloud-based information storage accounts).

B.  *Return of Company Property.* I understand that anything that I created or worked on for the Company while working for the Company belongs solely to the Company and that I cannot remove, retain, or use such information without the Company's express written permission. Accordingly, upon separation from employment with the Company or upon the Company's request at any other time, I will immediately deliver to the Company, and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Company Confidential Information, Associated Third Party Confidential Information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such information, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items including, without limitation, those records maintained pursuant to **Section 3.D**. Notwithstanding the foregoing, I understand that I am allowed to keep a copy of the Company's employee handbook and personnel records relating to my employment.

C.  *Return of Company Information on Company Electronic Media Equipment.* In connection with my obligation to return information to the Company, I agree that I will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained in Company Electronic Media Equipment before I return the information to the Company.

D.  *Return of Company Information on Personal Electronic Media Equipment.* In addition, if I have used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including, but not limited to, Company Confidential Information, I agree to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information and, if I locate such information, I agree to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company information from those equipment and systems. I agree to cooperate reasonably with the Company to verify that the necessary copying is completed (including upon request providing a sworn declaration confirming the return of property and deletion of information), and, upon confirmation of compliance by the Company, I agree to delete and expunge all Company information.

-6-

Giddy-00036

E. *No Expectation of Privacy in Company Property.* I understand that I have no expectation of privacy in Company property, and I agree that any Company property is subject to inspection by Company personnel at any time with or without further notice. As to any personal Electronic Media Equipment or personal Electronic Media Systems that I have used for Company purposes, I agree that the Company, at its sole discretion, may have reasonable access, as determined by the Company in good faith, to such personal Electronic Media Equipment or personal Electronic Media Systems to review, retrieve, destroy, or ensure the permanent deletion of Company information from such equipment or systems or to take such other actions necessary to protect the Company or Company property, as determined by the Company reasonably and in good faith. I also consent to an exit interview and an audit to confirm my compliance with this Section 5 and I will certify in writing that I have complied with the requirements of this Section 5.

### 6.    TERMINATION CERTIFICATION

Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the "Termination Certification" attached hereto as <u>Exhibit C</u>.

### 7.    NOTIFICATION OF NEW EMPLOYER

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement. I also agree to keep the Company advised of my home and business address for a period of three (3) years after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

### 8.    COVENANT NOT TO COMPETE AND NO SOLICITATION

A. *Covenant Not to Compete.* I agree that during the course of my employment and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, at the option either of the Company or myself, with or without notice, I will not, without the prior written consent of the Company: (i) serve as a partner, principal, licensor, licensee, employee, consultant, officer, director, manager, agent, affiliate, representative, advisor, promoter, associate, investor, or otherwise for (except for passive ownership of one percent (1%) or less of any entity whose securities have been registered under the Securities Act of 1933, as amended, or Section 12 of the Securities Exchange Act of 1934, as amended); (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of; or (iii) build, design, finance, acquire, lease, operate, manage, control, invest in, work or consult for or otherwise join, participate in or affiliate myself with, any business whose business, products or operations are in any respect involved in the Covered Business. For purposes of this Agreement, "**Covered Business**" shall mean any business in which the Company is engaged or in which the Company has plans to be engaged, or any service that the Company provides or has plans to provide. The foregoing covenant shall cover my activities in every part of the Territory. For purposes of this Agreement, "**Territory**" shall mean: (i) all counties in the State of Texas; (ii) all other states of the United States of America in which the Company provided goods or services, had customers, or otherwise conducted business at any time during the two-year period prior to the date of the termination of my relationship with the Company; and (iii) any other countries from which the

-7-

Giddy-00037

Company maintains non-trivial operations or facilities, provided goods or services, had customers, or otherwise conducted business at any time during the two-year period prior to the date of the termination of my relationship with the Company. Should I obtain other employment during my employment with the Company or within twelve (12) months immediately following the termination of my relationship with the Company, I agree to provide written notification to the Company as to the name and address of my new employer, the position that I expect to hold, and a general description of my duties and responsibilities, at least three (3) business days prior to starting such employment.

### B. *No Solicitation.*

(1) *Non-Solicitation of Customers.* I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, at the option either of the Company or myself, with or without notice, I will not contact, or cause to be contacted, directly or indirectly, or engage in any form of oral, verbal, written, recorded, transcribed, or electronic communication with any Customer for the purposes of conducting business that is competitive or similar to that of the Company or for the purpose of disadvantaging the Company's business in any way. For purposes of this Agreement, "**Customer**" shall mean all persons or entities that have used or inquired of the Company's services at any time during the two-year period preceding the termination of my employment with the Company. I acknowledge and agree that the Customers did not use or inquire of the Company's services solely as a result of my efforts, and that the efforts of other Company personnel and resources are responsible for the Company's relationship with the Customers. I further acknowledge and agree that the identity of the Customers is not readily ascertainable or discoverable through public sources, and that the Company's list of Customers was cultivated with great effort and secured through the expenditure of considerable time and money by the Company.

(2) *Non-Solicitation of Employees.* I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, at the option either of the Company or myself, with or without notice, I will not directly or indirectly hire, solicit, or recruit, or attempt to hire, solicit, or recruit, any employee of the Company to leave their employment with the Company, nor will I contact any employee of the Company, or cause an employee of the Company to be contacted, for the purpose of leaving employment with the Company.

(3) *Non-Solicitation of Others.* I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, at the option either of the Company or myself, with or without notice, I will not solicit, encourage, or induce, or cause to be solicited, encouraged or induced, directly or indirectly, any franchisee, joint venture, supplier, vendor or contractor who conducted business with the Company at any time during the two-year period preceding the termination of my employment with the Company, to terminate or adversely modify any business relationship with the Company or not to proceed with, or enter into, any business relationship with the Company, nor shall I otherwise interfere with any business relationship between the Company and any such franchisee, joint venture, supplier, vendor or contractor.

-8-

Giddy-00038

C. *Acknowledgements.* I acknowledge that I will derive significant value from the Company's agreement to provide me with Company Confidential Information to enable me to optimize the performance of my duties to the Company. I further acknowledge that my fulfillment of the obligations contained in this Agreement, including, but not limited to, my obligation neither to disclose nor to use Company Confidential Information other than for the Company's exclusive benefit and my obligations not to compete and not to solicit contained in subsections (A) and (B) above, is necessary to protect Company Confidential Information and, consequently, to preserve the value and goodwill of the Company. I also acknowledge the time, geographic and scope limitations of my obligations under subsections (A) and (B) above are fair and reasonable in all respects, especially in light of the Company's need to protect Company Confidential Information and the scope and nature of the Company's business, and that I will not be precluded from gainful employment if I am obligated not to compete with the Company or solicit its customers, employees, or others during the period and within the Territory as described above. In the event of my breach or violation of this Section 8, or good faith allegation by the Company of my breach or violation of this Section, the restricted periods set forth in this Section be tolled until such breach or violation, or dispute related to an allegation by the Company that I have breached or violated this Section has been duly cured or resolved, as applicable. I agree that nothing in this Section shall affect my continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, my obligations under Section 2.

D. *Separate Covenants.* The covenants contained in subsections (A) and (B) above shall be construed as a series of separate covenants, one for each city, county and state of any geographic area in the Territory. Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenant contained in subsections (A) and (B) above. If, in any judicial or arbitral proceeding, a court or arbitrator refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be revised, or if revision is not permitted it shall be eliminated from this Agreement, to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In the event that the provisions of subsections (A) and (B) above are deemed to exceed the time, geographic or scope limitations permitted by applicable law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, then permitted by such law. In the event that the applicable court or arbitrator does not exercise the power granted to it in the prior sentence, I and the Company agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term.

9.  **CONFLICT OF INTEREST GUIDELINES**

I agree to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines. A copy of the Company's current Conflict of Interest Guidelines is attached as <u>Exhibit D</u> hereto, but I understand that these Conflict of Interest Guidelines may be revised from time to time during my employment.

Giddy-00039

## 10.   REPRESENTATIONS

Without limiting my obligations under Section 3. E. above, I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent and warrant that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

## 11.   AUDIT

I acknowledge that I have no reasonable expectation of privacy in any Company Electronic Media Equipment or Company Electronic Media System. All information, data, and messages created, received, sent, or stored in Company Electronic Media Equipment or Company Electronic Media Systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes in the Company's sole discretion. I understand that I am not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that I shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which I will have access in connection with my employment. In addition, as to any personal Electronic Media Equipment or personal Electronic Media Systems or other personal property that I have used for Company purposes, I agree that the Company may have reasonable access to such personal Electronic Media Equipment or personal Electronic Media Systems or other personal property to review, retrieve, destroy, or ensure the permanent deletion of Company information from such equipment or systems or property or take such other actions that are needed to protect the Company or Company property, as determined by the Company reasonably and in good faith.

I am aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any Company Electronic Media Equipment or Company Electronic Media Systems. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through Company Electronic Media Equipment or Electronic Media Systems, with or without notice to me and/or in my absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by me), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information I have downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

-10-

Giddy-00040

## 12.    ARBITRATION AND EQUITABLE RELIEF

A. *Arbitration.* IN CONSIDERATION OF MY EMPLOYMENT WITH THE COMPANY, ITS PROMISE TO ARBITRATE ALL EMPLOYMENT-RELATED DISPUTES WITH ME, AND MY RECEIPT OF THE COMPENSATION, PAY RAISES, AND OTHER BENEFITS PAID TO ME BY THE COMPANY, AT PRESENT AND IN THE FUTURE, I AGREE THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES THAT I MAY HAVE WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM MY EMPLOYMENT OR RELATIONSHIP WITH THE COMPANY OR THE TERMINATION OF MY EMPLOYMENT OR RELATIONSHIP WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE FEDERAL ARBITRATION ACT AND PURSUANT TO THE ARBITRATION PROVISIONS SET FORTH IN THE TEXAS GENERAL ARBITRATION ACT (THE "**TEXAS ACT**") AND TEXAS LAW. THE FEDERAL ARBITRATION ACT GOVERNS THIS AGREEMENT AND SHALL CONTINUE TO APPLY WITH FULL FORCE AND EFFECT, NOTWITHSTANDING THE APPLICATION OF PROCEDURAL RULES SET FORTH IN THE TEXAS ACT AND TEXAS LAW. **I AGREE TO ARBITRATE ANY AND ALL COMMON LAW AND/OR STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, THE FAIR LABOR STANDARDS ACT, THE FAMILY AND MEDICAL LEAVE ACT, THE TEXAS COMMISSION ON HUMAN RIGHTS ACT, CLAIMS RELATING TO EMPLOYMENT STATUS, CLASSIFICATION AND RELATIONSHIP WITH THE COMPANY, AND CLAIMS OF HARASSMENT, DISCRIMINATION, WRONGFUL TERMINATION, AND BREACH OF CONTRACT, EXCEPT AS PROHIBITED BY LAW. I ALSO AGREE TO ARBITRATE (EXCEPT AS PROHIBITED BY LAW) ANY AND ALL DISPUTES ARISING OUT OF OR RELATING TO THE INTERPRETATION OR APPLICATION OF THIS AGREEMENT TO ARBITRATE, BUT NOT DISPUTES ABOUT THE ENFORCEABILITY, REVOCABILITY OR VALIDITY OF THIS AGREEMENT TO ARBITRATE OR ANY PORTION HEREOF. WITH RESPECT TO ALL SUCH CLAIMS AND DISPUTES THAT I AGREE TO ARBITRATE, I HEREBY EXPRESSLY AGREE TO WAIVE, AND DO WAIVE, ANY RIGHT TO A TRIAL BY JURY.** I FURTHER UNDERSTAND THAT THIS AGREEMENT TO ARBITRATE MAY NOT APPLY TO ANY DISPUTES THAT THE COMPANY MAY HAVE WITH ME AND THAT THE COMPANY MAY PURSUE DISPUTES AGAINST ME IN ARBITRATION OR AN APPLICABLE COURT OF LAW. I UNDERSTAND THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF ANY RIGHTS I MAY HAVE UNDER APPLICABLE LAW, INCLUDING, BUT NOT NECESSARILY LIMITED TO, SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT OR THE SARBANES-OXLEY ACT, INCLUDING ANY RIGHTS PROHIBITING COMPULSORY ARBITRATION. SIMILARLY, NOTHING IN THIS AGREEMENT PROHIBITS ME FROM ENGAGING IN PROTECTED ACTIVITY, AS SET FORTH BELOW.

Giddy-00041

B. *Procedure.* I AGREE THAT ANY ARBITRATION WILL BE ADMINISTERED BY JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("**JAMS**"), PURSUANT TO ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES (THE "**JAMS RULES**"), WHICH ARE AVAILABLE AT http://www.jamsadr.com/rules-employment-arbitration/ AND FROM HUMAN RESOURCES. I AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION, AND MOTIONS TO DISMISS, APPLYING THE STANDARDS SET FORTH UNDER THE TEXAS RULES OF CIVIL PROCEDURE. I AGREE THAT THE ARBITRATOR SHALL ISSUE A WRITTEN DECISION ON THE MERITS. I ALSO AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR MAY AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY, WHERE PERMITTED BY APPLICABLE LAW. I AGREE THAT THE DECREE OR AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED AS A FINAL AND BINDING JUDGMENT IN ANY COURT HAVING JURISDICTION THEREOF. I UNDERSTAND THAT THE COMPANY WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT I SHALL PAY ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION THAT I INITIATE, BUT ONLY SO MUCH OF THE FILING FEES AS I WOULD HAVE INSTEAD PAID HAD I FILED A COMPLAINT IN A COURT OF LAW. I AGREE THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN ACCORDANCE WITH TEXAS LAW, INCLUDING THE TEXAS RULES OF CIVIL PROCEDURE AND THE TEXAS RULES OF EVIDENCE, AND THAT THE ARBITRATOR SHALL APPLY SUBSTANTIVE AND PROCEDURAL TEXAS LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO RULES OF CONFLICT-OF-LAW. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH TEXAS LAW, TEXAS LAW SHALL TAKE PRECEDENCE. I AGREE THAT ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED IN TRAVIS COUNTY, TEXAS.

C. *Remedy.* EXCEPT AS PROVIDED BY THE TEXAS ACT OR THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE, AND FINAL REMEDY FOR ANY DISPUTE BETWEEN ME AND THE COMPANY. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE TEXAS ACT AND THIS AGREEMENT, NEITHER I NOR THE COMPANY WILL BE PERMITTED TO PURSUE OR PARTICIPATE IN A COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

D. *Administrative Relief.* I UNDERSTAND THAT THIS AGREEMENT DOES NOT PROHIBIT ME FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE TEXAS WORKFORCE COMMISSION, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OR THE NATIONAL LABOR RELATIONS BOARD, THE SECURITIES AND EXCHANGE COMMISSION, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE ME FROM PURSUING A COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

-12-

E. *Voluntary Nature of Agreement*. I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES, AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT *I AM WAIVING MY RIGHT TO A JURY TRIAL*. FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

### 13. MISCELLANEOUS

A. *Governing Law; Consent to Personal Jurisdiction*. This Agreement will be governed by the laws of the State of Texas without regard to Texas' conflicts-of-law rules that may result in the application of the laws of any jurisdiction other than Texas. To the extent that any lawsuit is permitted under this Agreement, I hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in Travis County, Texas for any lawsuit filed against me by the Company.

B. *Assignability*. This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. The Associated Third Parties are intended third-party beneficiaries to this Agreement with respect to my obligations in Section 2.D. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all, or substantially all, of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise. For the avoidance of doubt, the Company's successors and assigns are authorized to enforce the Company's rights under this Agreement.

C. *Entire Agreement*. This Agreement, together with the Exhibits herein and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me with respect to the subject matter herein and supersedes any and all prior written and oral agreements, discussions, or representations between us, including, but not limited to, any representations made during my interview(s) or relocation negotiations. I represent and warrant that I am not relying on any statement or representation not contained in this Agreement. Any subsequent change or changes in my duties, salary, compensation, conditions or any other terms of my employment will not affect the validity or scope of this Agreement.

D. *Headings*. Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

E. *Severability*. If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

Giddy-00043

F.   *Modification, Waiver.* No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the President or CEO of the Company and me. Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

G.   *Survivorship.* The rights and obligations of the Parties to this Agreement will survive termination of my employment with the Company.

H.   *Applicability to Past Activities.* The Company and I acknowledge that I have been engaged to provide services by the Company for a period of time prior to the date of this Agreement starting on June 10, 2019 (the "**Prior Engagement Period**"). Accordingly, I agree that if and to the extent that, during the Prior Engagement Period: (i) I received access to any information from or on behalf of Company that would have been Company Confidential Information if I received access to such information during the period of my employment with the Company under this Agreement; or (ii) I conceived, created, authored, invented, developed or reduced to practice any item, including any intellectual property rights with respect thereto, that would have been an Invention if conceived, created, authored, invented, developed or reduced to practice during the period of my employment with the Company under this Agreement; then any such information shall be deemed Company Confidential Information hereunder and any such item shall be deemed an Invention hereunder, and this Agreement shall apply to such information or item as if conceived, created, authored, invented, developed or reduced to practice under this Agreement.

## 14.   PROTECTED ACTIVITY NOT PROHIBITED

I understand that nothing in this Agreement limits or prohibits me from filing a charge or complaint with, or otherwise communicating or cooperating with or participating in any investigation or proceeding that may be conducted by, any federal, state or local government agency or commission, including the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the Occupational Safety and Health Administration, and the National Labor Relations Board (**"Government Agencies"**), including disclosing documents or other information as permitted by law, without giving notice to, or receiving authorization from, the Company. Notwithstanding, in making any such disclosures or communications, I agree to take all reasonable precautions to prevent any unauthorized use or disclosure of any information that may constitute Company Confidential Information to any parties other than the Government Agencies. I further understand that I am not permitted to disclose the Company's attorney-client privileged communications or attorney work product. In addition, I hereby acknowledge that the Company has provided me with notice in compliance with the Defend Trade Secrets Act of 2016 regarding immunity from liability for limited disclosures of trade secrets. The full text of the notice is attached in Exhibit B.

Date:   3/2/2020

Signature

ERNEST KIM

Name of Employee (typed or printed)

-14-

## **EXHIBIT A**

### **LIST OF PRIOR INVENTIONS**
### **AND ORIGINAL WORKS OF AUTHORSHIP**

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

✓ No inventions or improvements

____ Additional Sheets Attached

Date: _____ 3/2/2020 _____

_____
Signature

_____ ERNEST KIM _____
Name of Employee (typed or printed)

-15-

Giddy-00045

## **EXHIBIT B**

## **SECTION 7 OF THE DEFEND TRADE SECRETS ACT OF 2016**

" . . . An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that—(A) is made—(i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. . . . An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual—(A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order."

Giddy-00046

## EXHIBIT C

**Giddy Holdings, Inc.**

### TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Giddy Holdings, Inc. (the "**Company**"). Notwithstanding the foregoing, I understand that I may keep a copy of the Company's employee handbook and personnel records relating to me.

I further certify that I have complied with all the terms of the Company's At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (the "**Agreement**") signed by me, including the reporting of any inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that Agreement.

I understand that pursuant to the Agreement, and subject to its protected activity exclusion, I am obligated to preserve, as confidential, all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also acknowledge that under the Agreement, for twelve (12) months from this date, I will not engage in any of the activities prohibited by Section 8 of the Agreement, including competition with the Company in the "Territory" defined in the Agreement, and solicitation of employees, customers, vendors, consultants, collaborators, agents, and contractors of the Company. After leaving the Company's employment, I will be employed by _____ in the position of _____ .

Date: _____

_____
Signature

_____
Name of Employee (typed or printed)

Address for Notifications:

_____

_____

-17-

Giddy-00047

# EXHIBIT D

## GIDDY HOLDINGS, INC. CONFLICT OF INTEREST GUIDELINES

It is the policy of Giddy Holdings, Inc. to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1. Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended. (The At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement elaborates on this principle and is a binding agreement.)

2. Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3. Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4. Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is, or appears to be, a personal or social involvement.

5. Initiating or approving any form of personal or social harassment of employees.

6. Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7. Borrowing from or lending to employees, customers, or suppliers.

8. Acquiring real estate of interest to the Company.

9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any other employer or other person or entity with whom obligations of confidentiality exist.

10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.

11. Making any unlawful agreement with distributors with respect to prices.

12. Improperly using or authorizing the use of any inventions that are the subject of patent claims of any other person or entity.

13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management

Giddy-00048

for review. Violations of this conflict of interest policy may result in immediate termination of employment.

Nothing in these guidelines is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law, including any rights an employee may have under Section 7 of the National Labor Relations Act. Also, nothing in these guidelines limits or prohibits employees from filing a charge or complaint with, or otherwise communicating or cooperating with or participating in any investigation or proceeding that may be conducted by, any federal, state or local government agency or commission, including the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the Occupational Safety and Health Administration, and the National Labor Relations Board ("Government Agencies"), including disclosing documents or other information as permitted by law, without giving notice to, or receiving authorization from, the Company. Notwithstanding, in making any such disclosures or communications, employees must take all reasonable precautions to prevent any unauthorized use or disclosure of any information that may constitute Company Confidential Information to any parties other than the Government Agencies. Employees may not disclose the Company's attorney-client privileged communications or attorney work product.

Giddy-00049

**Giddy**

## Policy Against Discrimination and Harassment

Giddy is committed to providing a work environment that is free of harassment. Giddy does not tolerate harassment of its job applicants, contractors or employees by another employee, supervisor, vendor, customer, or any third party. Any form of harassment on the basis of race, color, national origin, citizenship (or immigration status), sex, pregnancy, sexual orientation, gender, gender identity, age, religion, physical or mental disability, genetic information (including family history), veteran or military status, expunged criminal records, child or spousal support withholding, or any other characteristic or status protected by federal, state or local laws is prohibited and will be treated as a disciplinary matter. Discrimination based on the perception of someone being in a protected class or affiliating with someone in a protected class is also unlawful. The spirit and intent of this policy also applies to all of our professional and client relationships.

### Harassment Defined

Harassment is unwelcome verbal, visual, written, or physical conduct creating an intimidating, offensive, or hostile work environment that interferes with work performance. Harassment can be verbal (including slurs, jokes, insults, epithets, derogatory comments, threats, gestures, or teasing), graphic (including offensive posters, symbols, cartoons, drawings, computer displays, or e-mails), or physical conduct (including physically threatening another, blocking someone's way, etc.) that denigrates or shows hostility or aversion towards an individual because of any protected characteristic. Such conduct violates this policy, even if it is not unlawful. Because it is difficult to define unlawful harassment, employees are expected to behave in a professional and respectful manner at all times.

### Sexual Harassment Defined

Sexual harassment can include all of the above actions, as well as other unwelcome conduct, such as unwelcome or unsolicited sexual advances, requests for sexual favors, conversations regarding sexual activities and other verbal or physical conduct of a sexual nature. Sexual harassing conduct need not be motivated by sexual desire or orientation, and hostile treatment can amount to sexual harassment regardless of whether it is motivated by sexual desire or orientation. The Company prohibits any verbal, written, physical, or visual conduct of a sexual or gender-stereotypical nature that unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive work environment.

Examples of conduct that violates this policy include, but are not limited to:

1. **Verbal harassment:** making requests for sexual favors, unwelcome sexual advances, engaging in sexually graphic or degrading sexual comments, derogatory jokes, comments or slurs about a person's body or negative stereotyping;

2. **Written harassment:** sending sexually suggestive, obscene, or offensive memoranda, letters, notes, emails, text messages, or cards;

3. **Physical harassment:** making offensive physical contact including hugging, touching, blocking movements, massaging, kissing, grabbing, pinching, patting, or brushing up against another person's body; or

4. **Visual harassment:** leering, making sexual gestures, displaying or distributing sexually suggestive cartoons, drawings, pictures, posters, or internet websites.

Giddy encourages appropriate and collegial relationships among employees; however, employees must be sensitive to conduct that may be considered offensive by fellow employees and must refrain from engaging in such conduct. Conduct prohibited by this policy is also unacceptable in any setting outside of the workplace, such as during business trips, business meetings or business-related social events regardless of whether the conduct is engaged in by a supervisor, co-worker, client, customer, vendor, or other third party.

**Giddy**

## Complaint Procedures

The following steps have been put into place to ensure the work environment at Giddy is respectful, professional, and free of harassment. If any employee believes someone has violated this policy, the employee should immediately report the matter to either their supervisor or another member of the management team. If the complaint involves a supervisor or the supervisor does not respond within three (3) business days, the employee should contact any member of the management team including the CEO or Giddy's outside Human Resources Consultants, Next Level Strategies (415.876.NEXT) or HR@getmegiddy.com.

If any supervisor at Giddy becomes aware of, or encounters harassment, or is informed by an employee of possible misconduct or harassment, even if the parties involved aren't part of that supervisor's department, the supervisor is required to report this information to the CEO within 24 hours of becoming aware of the complaint or being informed of possible harassing behavior.

## Investigation

All reports of harassment will be taken seriously and will be investigated promptly, objectively, and thoroughly. Giddy will endeavor to protect the privacy and confidentiality of all parties involved, except to the extent necessary to conduct a thorough investigation. Giddy will conduct an objective and timely investigation, which will be documented and tracked. Giddy will also inform the complainant of its findings.

Giddy expects employees to cooperate in investigations by participating in interviews and answering interview questions to the best of their knowledge. Employees that attempt to impede, actually impede, or otherwise take steps to undermine the integrity of an investigation will be considered in violation of this policy.

## Discipline

Giddy has zero tolerance for harassing behavior and will take corrective action. If the improper behavior is that of a non-employee, Giddy will also take appropriate action. Anyone, regardless of position or title, whom Giddy determines has engaged in conduct that violates this policy will be subject to discipline, up to and including termination. If a violation of this policy occurs, discipline may be imposed, even when the conduct does not constitute a violation of any laws prohibiting harassment or discrimination. Any employee who violates this policy may be personally liable for monetary damages that are the result of their own actions.

## Retaliation

Giddy will not tolerate any retaliation against an employee, unpaid intern, or volunteer for making a legitimate complaint of discrimination or harassment, for assisting another in making such a complaint, or for participating in an investigation of a complaint. Retaliation is a violation of the law and this policy and will result in discipline, up to and including termination. Any employee who experiences or witnesses any conduct that they believe to be retaliation should immediately follow the complaint procedures described above. Anyone, regardless of position or title, whom Giddy determines has engaged in conduct that violates this policy against retaliation will be subject to discipline, up to and including termination.

Giddy cannot remedy claimed harassment or retaliation unless employees bring these claims to the attention of management. Failure to report claims of harassment and/or retaliation prevents management from taking steps to remedy the problem.

## Additional Enforcement Information

In addition to Giddy's internal complaint procedure, employees should also be aware that the federal Equal Employment Opportunity Commission (EEOC) and the Texas Workforce Commission (TWC) investigate and prosecute complaints of harassment in employment. Employees who believe that they have been discriminated against or harassed may file a complaint with either of these agencies. For more information, contact Human Resources. You may also contact the nearest office of the EEOC or TWC, as listed online or in the telephone directory.

**Giddy**

Signature: _____

Name (Print): ___ERNEST  KIM___

Dated: ___3 | 2 | 2020___

**Giddy**

# Company Property Receipt Acknowledgment & Authorization

I acknowledge receipt of the following security access information from Giddy (the "Company"):

☑ Keys: _____

☐ Alarm Code: _____

☑ Computer Access Code: _____

☐ Video Equipment, Projectors: _____ N|A _____

☐ Product Samples (unused): _____

☑ Laptop, Charging Cord, Carrying Case, Keyboards, Monitors & Mouse: _____

☐ Headphones: _____

☐ Other: _____

I understand and agree to the following:

1. This property and information is considered property of the Company and given to me conditionally and intended for my use only in the performance of my assigned job duties.
2. I am not allowed to share this property or information with any other person.
3. The company property and information in my possession are not to be duplicated under any circumstances.
4. I will exercise due care in my use of this property and information and that negligence will be considered cause for disciplinary action, which may result in discharge.
5. Keys, laptop, equipment, or other Company property issued to me and for my use must be returned at the time of my separation from employment.
6. I may be responsible for reimbursing the Company for damage arising out of my failure to comply with this policy.
7. The Company will pursue reimbursement for any unreturned items through all legal means available.

**EMPLOYEE**

_____
Signature of Employee

ERNEST KIM
Print Name of Employee

3 | 2 | 2020
Date

**GIDDY**

_____
Signature of Supervisor

_____
Print Name of Supervisor

_____
Date



Giddy-00066



**Ernie Kim** ▮▮▮▮▮▮▮ · 21h

@ravenambers interested in covering a story that involves a racial discrimination, a fraud to secure more money from PPP, and much more in one single story?

**Ernie Kim** ▮▮▮▮▮▮▮ · 21h

@ErinBurnett a follower since CNBC days. I have one story that involves SEC fraud, fraud with PPP (governtment funding), forcing employees to come to work despite Covid 19 lockdown and wrongful termination because Asian people created Covid 19. Yes, all in one sorry. Interested?

**Ernie Kim** ▮▮▮▮▮▮▮ · 23h

@MettaWorld37 someone might be using your name to pull a fraud in a company you might have invested in.

**Ernie Kim** ▮▮▮▮▮▮▮ · Apr 5

@Ozzy_Statesman do you need an a interesting story report?  Message me.

Giddy-00067