**United States District Court**
WESTERN DISTRICT OF TEXAS

**AUSTIN DIVISION**

| | | |
|---|---|---|
| GIDDY HOLDINGS, INC. | § | |
| | § | |
| Plaintiff/Counter Defendant, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:20-cv-00434 |
| | § | |
| ERNEST KIM, | § | |
| | § | |
| Defendant/Counter Plaintiff. | § | |
| | § | |
| | § | |

**DEFENDANT/COUNTER-PLAINTIFF, ERNEST KIM'S, RESPONSE TO GIDDY
HOLDING'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE OF THIS COURT:

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule CV-7(d), Defendant Ernest

Kim ("Kim") files this Response to Plaintiff's ("Giddy") Motion for Summary Judgment [Doc.

66]. In support, Kim respectfully shows this Court the following:

**I.
SUMMARY OF RESPONSE**

1. Giddy filed its Motion for Summary Judgment stating that Kim's testimony, Giddy's

corporate representative's testimony, and Giddy's Chief Technology Officer's affidavit establish

all the elements of Giddy's seven (7) causes of action. [Doc 66, p. 1]. Giddy utilizes much of the

Motion exaggerating the factual probative evidence in this matter, mischaracterizing and

piecemealing Kim's own Motion for Summary Judgment in effort to gain credibility, and attacking

Kim's own credibility, all for which the vehicle of summary judgment is improper.

2. Kim argues in this Response that Giddy has still offered no evidence supporting its claims

in such a way that they are ripe for summary judgment favoring Giddy. Giddy again relies entirely

on unsubstantiated and conclusory assertions as specific evidence. Even when the parties take

Giddy's general assertions as true, the testimony of Brett Jacobson and the affidavits of Giddy's technology department employees, at most what is before this Court are fact questions, many of which are immaterial, for a jury to decide.

3.      The facts remain clear—Kim never acted in a way that resulted in material harm to Giddy. Kim never intentionally destroyed or destroyed Plaintiff's data, Kim never obtained valuable information of Giddy's after his termination, Kim never utilized or gave away a single piece of Giddy's information, including trade secrets, to anyone.

4.      Giddy's own CEO admitted a technology expert would be necessary to prove their suspicions regarding Kim's alleged actions. Giddy has retained no experts to date. Giddy's CEO is not an expert in any field. Giddy's Chief Technology Officer or employees are not experts in any field.

5.      Lastly, Giddy heavily relies on two affidavits from Roman Bulkiewicz, Giddy's Chief Technology Officer, and IT employee, Trey Carden, as the iron fist of evidence proving its claims. However, as stated below, these affidavits still show no concrete evidence of the purported steps Kim took to allegedly disable pre-installed software, the purported steps taken by Giddy to recover alleged information, the purported nature of the documents that no longer exist, the purported quantity of documents that were deleted, the purported means by which Kim allegedly specifically deleted data from the shared drive. The affidavits offer no date, time, or name who administered alleged training on IT policies to Kim. The affidavits offer no more than a calculated, copied verbatim suspicion—all of which do not prove the elements of its causes of action.

6.      This Response will address the inconsistencies, contradictions, and immaterial fact questions set out by Giddy. This Response will show that when looking at the definitive material facts in evidence, summary judgment is improper for Giddy on all seven causes of action because

there is no, and never will be, any credible evidence in support. In fact, the evidence shows no such element on any claim is conclusive. At most, fact issues are created for a jury to decide which still makes summary judgment in favor of Giddy improper.

## II.
## OBJECTIONS

7.      Pursuant to Fed. R. Civ. P. 56(c)(2), Kim makes the following objections regarding certain evidence submitted in support of Giddy's Motion.

8.      Kim objects to the Declaration of Roman Bulkiewicz to the extent Giddy seeks to classify him as an expert witness. Kim further objects to paragraph 4 and 5 because it conclusory and speculative. Kim further objects to the Declaration of Roman Bulkiewicz paragraph 6 as conclusory, speculative, and unsupported by the evidence. Further, it contradicts legal arguments made in Giddy's Motion. Kim further objects to the Declaration of Roman Bulkiewicz paragraph 7 as conclusory, hearsay, a statement that requires expert testimony, not lay person, it lacks foundation, is not based on sufficient facts or data, is not the opinion based on reliable principles and methods. Kim further objects to the Declaration of Roman Bulkiewicz paragraph 7 in that the statement "it would have to be intentional" is an inadmissible legal conclusion by a lay person, speculation, and conclusory, and lacks foundation. Kim further objects to the Declaration of Roman Bulkiewicz paragraph 8 as conclusory, mischaracterizes Kim's testimony, and speculative. Kim further objects to the Declaration of Roman Bulkiewicz paragraph 7-8 as statements of opinion which is incompetent summary judgment evidence. It further is a statement of opinion Kim further objects to the Declaration of Roman Bulkiewicz paragraph 9 as conclusory and a statement of opinion that lacks foundation. Kim further objects to the Declaration paragraph 10 as conclusory, speculative, a statement of opinion that lacks foundation.

9.     Kim objects to the Declaration of William Trey Carden to the extent Giddy seeks to classify him as an expert witness. Kim further objects to paragraph 4-5 because it conclusory and speculative and the statement "the document can be lost forever" as a statement of opinion which lacks foundation and that which requires expert testimony. Kim further objects to paragraph 6 as conclusory and speculative and containing statement of opinion which lacks foundation and that which requires expert testimony. Kim further objects to paragraph 7 in that the statement "it would have to be intentional" is an inadmissible legal conclusion by a lay person, speculation, and conclusory, and lacks foundation. Kim further objects to the Declaration paragraph 8 as conclusory, and speculative. Kim further objects to the Declaration paragraph 6-9 as statements of opinion which is incompetent summary judgment evidence, conclusory, and lacks foundation.

### III.
### STATEMENT OF FACTS

10.    Giddy Holdings, Inc. ("Giddy") manufactures and sells erectile dysfunction device treatments to men. Brett Jacobson ("Jacobson") is the CEO and Founder. *See* "Declaration of Ernest Kim", **EXHIBIT A**, **¶3**. On February 17, 2020, Giddy offered Kim the position of Chief Marketing Officer, and Jacobson sent Kim an Offer of Employment with details of his prospective employment. *See* **EX. A**, ¶5; *also see* "Offer Letter", **EXHIBIT B**.

11.    Giddy admitted Kim's employment was expressly conditioned on execution of an employee handbook including provisions for confidential information, non-disclosure and non-disparagement. **EX. A**, ¶9; [Doc 1, ¶10]. The provisions protect the company. [Doc 1, p. 13-28]. Kim complied with Giddy's demand because he was told it was a "routine" document **EX. A**, ¶9, 10; [Doc 1, p.28].

12.    In his role as CMO, Giddy provided Kim a laptop and company email through respective cloud servers and collaboration tools, Google Doc and Gmail. *See* Deposition of Ernest Kim,

December 2020, **EXHIBIT C**, 190:24-25, 192:12-17, 193:7-8, 16-18, 199:18-200:17, 200:25-201:8, 201:24-25; **EX. A**, ¶11-13. Giddy has already admitted the documents allegedly on the laptop were copies. **EX. A**, ¶14; [Doc 1, ¶27], also see *Pl. Ans. to Def. Interrog.*, **EXHIBIT E**, p. 4-6, 11. Kim was also informed the documents he had access to from the laptop were mere copies whereby the originals were held by Giddy. **EX. A**, ¶14.

13.     Despite Giddy's IT employees' general assumptions about training and administered to all new employees in their corresponding affidavits (neither confirm date, time, or person who informed Kim specifically), Kim testified he personally received no training on IT policies other than how to log into the Apple Laptop, in which he was informed he could create his own personal Apple ID. **EX. C**, 82:10-83:13.

14.     Despite Giddy's insistent assertion that Kim was given "extensive" access to its proprietary and confidential information in the one- month tenure of Kim's employment, including "marketing plans," [Doc 66, p. 1-2], when Kim began his employment, "there were no marketing plans," which is why he was hired in the first place. **EX. C,** 113:24-114:9.

15.     In March 2020, the COVID-19 pandemic struck the US. During that time, Kim voiced internal concerns and objected to Giddy Holdings submission of data for Federal Paycheck Protection Program loan due to submission of improperly inflated data to secure larger amount. **EX. A**, ¶16; also see *Depo. of E. Kim, April 2, 2021.*, **EXHIBIT D**, 8:23-10:8, 11:2-3, 12:22-23. Further, when the pandemic began, Kim personally saw a change in his professional relationship with his employer, specifically and directly, with Jacobson. Jacobson frequently blamed Kim, an Asian-American, and all Asians for causing the COVID-19 virus and pandemic. **EX. A**, ¶15.

16.     On April 3, 2020, Giddy Holdings, through email correspondence from the General Counsel, demanded that Kim be tested for COVID-19 for illness reported by Kim in late March.

EX. A, ¶17-18. Jacobson would not let Kim come back to the office without a doctor's note saying Kim was COVID-free. *Id*. Upon receipt of this email in conjunction with no access to the Giddy server, Kim testified he believed he was terminated. *Id*; **EX. D**, 198: 16-23. Kim still followed his employer's demands, procured a COVID-19 test at Dallas Testing Center on April 4, 2020, and informed Taune, an employee of Giddy Holdings. *Id* at ¶19; **Ex. D**, 157:1-15; 173:25-174:1. Kim tested negative. *Id*; **Ex. D**, 174:9-10. 187:12-188:3. These facts are material because they directly rebut Giddy's false narrative regarding its conversion claim.

17.     On April 6, 2020, Giddy's pattern of acting on false hunches/suspicion went into action when it utilized a made-up notion regarding Kim's credibility, which conveniently Giddy has pushed in all motion practice up to this point (without evidence as W2s were produced shutting down the rumor) and fired Kim via email correspondence from its General Counsel because his "resume and job application included both false information and misleading representations." **EX. A**, ¶20.

18.     Further, to be clear, on April 6, 2020, while Kim was abiding by Dallas County quarantine requirements, Giddy demanded the laptop be returned, and it is undisputed that Kim complied and even broke Dallas County quarantine guidelines to do so in effort to do what Giddy demanded. **EX. A**, ¶22. Kim returned the laptop on April 13, 2020, with proof, not "well after the requested deadline" [Doc. 66, p. 4], as Giddy would have this Court believe. **EX. C**, 186:3-24.

19.     Kim truthfully conceded that after his termination and prior to returning the laptop, Kim went onto the laptop—for one sole purpose—to "de-link" his own personal Apple ID login by performing a factory reset to the state it was in when received, so that Giddy would no longer have access to Kim's own personal information. **EX. A**, ¶26, 28; **Ex. C**, 190:13-18; 198:3-8. Kim

truthfully detailed the extent of the documents deleted from the laptop itself: two stock background photos. **Ex. C**, 85:24-86:10.

20.     Kim truthfully conceded that he screen shotted emails he was part of showing approval for entering contracts and utilization of marketing funds during his employment in response to a letter he received from Giddy after his termination, not "marketing emails and data" as alleged by Giddy [Doc. 66, p. 4]. **EX. C**, 14:14-16:3. He took no screen shots of confidential information or all emails in the account. *Id*; **Ex. C**, 16:22-17:12. No Giddy employee told him to delete the email from his iPhone. *Id*; **Ex. C**, 16:20-21.

21.     Kim understood, without any training from IT, that documents would be tracked and shared through the Cloud servers. *Id*. In fact, the affidavits of Giddy's own IT employees show that Kim shared the Marketing Plans and PR Stunt Ideas with the marketing team affirming that understanding.

22.     When Kim accessed the laptop after his termination, Kim did not delete documents, copies, or emails because they were saved on the cloud platforms. **EX. A**, ¶24, 26, 27-28; **Ex. C**, 190:21-25; 191:1-24.

23.     Giddy, in its Motion for Summary Judgment, has now most recently accused Kim of masterfully disabling pre-installed programs and access points (though Giddy does not state what those points are) through a multi-step process (though Giddy does not state what those steps are or process is), in order to intentionally delete Giddy documents and data (though Giddy cannot name a single document it suspects was deleted).

24.     Giddy tries to state that Kim's factory reset in effort to de-link his Apple ID was actually Kim specifically going into the shared drive and deleting some unknown data/documents created and previously shared by Kim to the team. However, upon close examination of the affidavits of

Bulkiewicz and Carden, Giddy's IT department employees, all these employees really declare is that if a user (like Kim) has access to a "particular document", he "**may have the ability to delete it from the shared drive."** (emphasis added). *See Ex. D to Giddy's MSJ*, ¶6. The IT personnel then states *if* a document is deleted, it is deleted across all employee's drives and accounts. *Id*.

25.    Giddy's Motion argues that the factory reset by Kim to de-link his Apple ID somehow "automatically" wiped clean all documents Kim ever shared or created on the company drive/server, and it cites to the IT personnel affidavits as supporting evidence. What the IT employees say compared to Giddy's legal argument is comparing apples to oranges. The IT personnel state the documents must have been particularly chosen and particularly deleted, not that there would be automatic deletion of anything. *Id*.

26.    Again, there is no evidence Kim was told about the extent of shared drive document deletion, there is no evidence Kim received IT training, there is no evidence that anyone but apparently now the IT personnel, after 16 months of litigation, knew such a thing could maybe happen. There is no evidence here that Kim did not share and/or back up and/or save any document created on the shared drive with the marketing team during his employment. In fact, the documents produced by Giddy itself are evidence that Kim complied with those instructions in full. *See* Bulkiewicz-1 and -2, attached to Doc. 66.  There is no evidence, above mere suspicion, that Kim deleted emails, deleted company data, deleted company documents, deleted, kept, or used company trade-secrets.

27.    Giddy cannot name a single person that provided IT training to Kim directly. Giddy cannot specify the alleged "specific protections" and "number of steps required" to delete the unknown documents. *See Ex. D to Giddy's MSJ*, ¶6-7.

28.     Giddy purports it knows many documents existed that do not now exist, that Jacobson "knows what files [Kim] had", yet Giddy cannot name a single document or nature of a document or file to date that it does not now actually have. *See Ex. D to Giddy's MSJ*, ¶10; Deposition of Brett Jacobson; **EXHIBIT E**; 144:1-8.

29.     Giddy states it is "almost impossible" to recover the alleged documents lost and that it cannot recover anything allegedly lost, but Giddy does not detail any steps ever taken to recover the same or the steps that have not been taken but will or should be nor produced any documents showing steps taken to recover such alleged lost data—because there is simply nothing material to recover. *Id*. Giddy's CEO himself testified they would need "a computer expert" to support these contentions. **EX. E**; 144:9-19. Giddy has not retained or designated any computer, forensic, or information tech expert in this matter. The testimony offered from Jacobson, Bulkiewicz and Carden is lay witness testimony based on general suspicion.

## IV.
## STANDARD OF REVIEW

30.     Summary judgment is appropriate pursuant to Fed. R. Civ. P. 56 when the pleadings, depositions, admissions, disclosure materials, and affidavits "shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if its "resolution" has the potential to affect the outcome. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012). A dispute of any issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 254. The movant carries the initial burden. *Celotex Corp. v. Catrett*, 477 U.S. 317, 319 (1986).

31.    If the moving party meets its initial burden, the nonmoving party must show there is material evidence to create a genuine fact issue on one or more elements of each claim before the court on summary judgment or show evidence supporting each and every element of an affirmative defense asserted against each such claim. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). The court reviews the record as a whole and "all evidence must be construed in light most favorable to the nonmovant. *Flock v. Scripto-Tokai Corp.*, LEXIS 23878, *1 (S.D. Tex. 2001).

**V.**
**ARGUMENTS AND AUTHORITIES**

32.    Giddy, again, consistently relies on circumstantial evidence, immaterial facts, and witness credibility arguments, in attempt to prove its claims on summary judgment grounds. The 5th Circuit states that "[c]onclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence." *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) (citations omitted).

**A.  Giddy Has Not Met Its Summary Judgment Burden to Show Kim Violated the CFAA**

33.    Giddy contends all four elements have been conclusively established. but as fully briefed in Kim's Reply to Giddy's Response to Kim's Motion for Summary Judgment.

34.    First, with respect to the first element of the CFAA claim, there is no credible evidence, let alone rising to the level of conclusive, that Kim accessed the laptop with the intent to exceed authority and obtain information. 18 U.S.C. §1030 (a)(2)(C). Giddy argues a cease and desist was sent "for return of property that left no question about his lack of authorization." [Doc. 66. P. 8]. Giddy cites to B-13, B-14 and B-16 as the documents supporting such contention, but these documents contain an email regarding "[instruction] to protect and return the company equipment

now in your possession, which includes a laptop…", the Fed Ex receipt showing the equipment was shipped, and a cease-and-desist letter regarding certain tweets made by Kim. *See* B-13, B-14, B-16 to Giddy's Motion. There is no evidence whereby specific instructions were provided to Kim regarding removal of personal information on the company laptop. There is no evidence Kim received any IT training regarding how to handle such procedures during his hire either. **EX. C**, 82:10-83:13.

35.     The 5th Circuit stated the term "without authorization" or "exceed authorized access" as without permission. "The CFAA defines "exceeds authorized access" as '" access[ing] a computer without authorization and [using] such access to obtain or alter information in the computer that the accesser is not entitled to obtain or alter." *United States v. Thomas*, 877 F.3d 591, 595 (5th Cir. 2017); *SMH Enters., L.L.C. v. Krispy Krunchy Foods, L.L.C.*, LEXIS 63423, *7, (E.D. LA 2021).

36.     Kim accessed the laptop to de-link his personally owned Apple ID containing his own personal information from the laptop. **EX. A**, ¶26, 28; **Ex. C**, 190:13-18; 198:3-8. Kim was entitled to obtain his own information. There is no evidence that Kim intentionally accessed the laptop exceeding or without authorization to obtain company information itself or that such access for the reason testified was expressly unauthorized. *See Giddy B-13, B-14, B-16; also see* **EX. A**, ¶26, 28; **Ex. C**, 190:13-18; 198:3-8. Giddy has not offered any proof that Kim knew he could not de-link his personal Apple ID upon return of property or that he accessed any obtainable Giddy information in doing so. **EX. C**, 82:10-83:13.

37.     Regarding the second element, nothing of value was obtained when Kim accessed the laptop to de-link his personal Apple ID. Further, even if this Court were to accept Giddy's factual assertions as true, specifically, that the factory reset caused some automatic deletion of Giddy's

shared drive data, and that Kim attempted, unsuccessfully, to access his email, there is still no evidence Kim obtained something of value from the access.

38.     Giddy only offers the deposition testimony of Giddy's CEO, Jacobson, to purportedly conclusively prove this element, specifically arguing that when Kim accessed the laptop and performed the reset, the entire computer itself was wiped locally from the hard drive and automatically from the hard drive. [Doc. 66, p. 9]. Again, there is absolutely no proof that a factory reset automatically wipes company data across shared drives and the entire Giddy organization, or else Giddy would have cited to it in this portion of its motion. Moreover, Kim testified he did not Ddelete any data. **EX. A**, ¶26, 28; **Ex. C**, 190:13-18; 198:3-8.

39.     The evidence shows, admitted by Giddy itself, that Giddy would need "a computer expert" to make these contentions more than mere contentions. **EX. E**; 144:9-19. The evidence shows that a user "**may**' have ability to delete a **"particular"** document from the shared drive only if a number of unidentified steps were taken to disable certain programs. *See Exs. D and E to Giddy's Motion*. There is no evidence Kim did any of these things or had reason to know any of these things because Giddy cannot produce a single policy or document showing training or written instructions regarding the same. Giddy cannot produce a single document or expert testimony that Kim retrieved something of value during the reset. Giddy offers lay witness testimony with no specific explanation to prove this element, and therefore it is not enough to meet its burden. The evidence shows only an Apple ID related to Kim personally was de-linked and recovered by Kim which does not equate to confidential company information, spreadsheets, or trade-secrets. **EX. A**, ¶26, 28; **Ex. C**, 190:13-18; 198:3-8. The evidence shows Kim did not delete any valuable company data. The evidence shows Kim shared documents, including marketing schedule and PR Stunt

Ideas with his marketing team during his employment, and did not delete it. *See EX. D and E to Giddy's Motion*.

40.     With respect to the third element, Giddy claims it is enough to show Kim accessed its systems after he knew such access was terminated. [Doc. 66, p. 9]. Again, Giddy characterizes element four of the CFAA, 18 U.S.C. §1030 (a)(4), in a limited manner as "knowingly and with intent to defraud." *Id*. The element also requires a showing that the means of such conduct "furthers the intended fraud." *Id*; therefore, Giddy cannot meet its burden on this element.

41.     Giddy argues that Kim's own testimony is evidence of violation of the CFAA in that he intended to remove his own personal Apple ID information from the laptop after termination and prior to returning the same as well as attempted access to retrieve certain emails. [Doc. 66, p. 9]. Giddy offers (1) the affidavits of IT personnel and (2) an attack of Kim's credibility with respect to his testimony, as evidence that supports its argument of Kim's intentional wrongdoing by Kim or that the conduct at issue furthered some intended fraud. [Doc. 66, p. 10]. Giddy argues those affidavits show Kim knew what he was doing, but fails to show Kim actually disabled certain programs, took some type of several steps to disable, and then specifically deleted each alleged document. Further, questioning Kim's credibility regarding whether he locally created documents is immaterial because the evidence produced by Giddy itself (see Bulkiewicz -1 and -2) shows Kim shared the documents with the team and saved them on the shared drive.

42.     The evidence shows Kim did not delete data to receive something of value in return, in fact Giddy has not shown any benefit Kim received or would have received by the actions in question. **EX. A, EX. C**, **and EX. D**. *United States v. Butler*, 16 Fed. Appx. 99 (4th Cir. 2001) (unpublished). Kim did not obtain any information, apparently screen shots of his prior company emails, to commit any fraud. **EX. A, EX. C**, **and EX. D**. *United States v. Lindsley*, 2001 WL 502832 (5th

Cir. 2001) (unpublished). Kim did not access the computer/phone to produce falsified documents for some pretend benefit. *United States v. Bae*, 250 F.3d 774 (D.C. Cir. 2001). **EX. A, EX. C, and EX. D**.  Giddy has not offered any evidence to identify intended wrongdoing by Kim, or any concrete fraud, benefit or value conferred to Kim. When considering the evidence in light most favorable to Kim, the nonmovant, it becomes clear Giddy has not met its initial burden. Moreover, in the alternative, at most, there is a fact question to be decided by the jury on this element.

43.     With respect to the CFAA requiring proof that Giddy was damaged in excess of $5,000.00 as a result of the alleged violation, Giddy again only offers the testimony of Giddy's CEO, Brett Jacobson, specifically alleging that there is damage equating to 1.2 million dollars as a result of the unauthorized access. [Doc 66, p. 83]. The evidence shows Giddy was not harmed at all as a result of the Apple de-link and the email screen shots. There are no receipts, no detail of remedial measures taken, production or reference to any specific business record, advertising spends, contract, affidavits from investors or IT personnel to prove its burden on this element regarding amount of damages. If anything, there is a genuine issue of material fact for the jury to decide despite Giddy's reliance on conclusory statements and speculative method of calculating damages.

**B. Giddy Was Not Injured Under The Harmful Access by A Computer Act Due to Issue of Consent to Obtain Personal Information**

44.     Giddy must show that it was "injured" or that its property was injured as a result of Kim's access of the laptop without effective consent of Plaintiff. Tex. Civ. Prac. & Rem. Code 143.001; Tex. Penal Code Ch. 33.02(a). Giddy cannot meet its burden regarding the damages element of this claim. Giddy contends in its Motion and relevant section that Kim expressly lacked consent to access the laptop, but as stated in the above section, there is no document stating said express lack of consent to retrieve personal Apple ID information before returning the laptop. Kim did not receive any IT training from Giddy. *See* **EX. B**. Moreover, the instruction to Kim was to "not

conduct any further work for Plaintiff" [Doc 1, ¶37]. As Kim understood, to unlink his Apple ID, it required a factor reset of the computer. **EX. A**, ¶26-28; **EX. C**,192:3-8, 192:25-193:3. No information or documentation was lost because all documents and his email were kept in the Cloud, and therefore, the "copies," new documents, and emails could not be lost, and Kim had shared the documents with his team during employment. [Doc 1, ¶27], **EX. C**,190:21-25; 193: 7-8; 193:13-18; 191:1-24; **EX. A**, ¶12-14, 24-29; *also see* Bulkiewicz -1 and -2 of Giddy's Motion. The evidence does not show what data, specifically by name or nature, was lost in order to show damages as a result. *Id*.

45.    Again, there are no receipts, no detail of remedial measures taken, production or reference to any specific business record, advertising spends, contracts, affidavits from investors or IT personnel to prove Giddy's burden on this element regarding amount of damages. Here, if anything, there is a genuine issue of material fact for the jury to decide despite Giddy's reliance on conclusory statements and speculative method of calculating damages. There is no evidence that forensic analysis was performed to recover data or what that alleged process entailed. Moreover, the affidavits from the IT personnel stated it would be near impossible to recover any potential lost data due to the factory reset, but Giddy has not mitigated its alleged damages by stating what else could be performed that has not. Further, no expert has been hired to recover any alleged lost data that resulted in alleged unquantifiable damages. Jacobson's testimony does not state what the $1.2 million in damages relates to or is for, other than a mere guesstimate.

**C. Kim Did Not Commit a Breach of Contract Nor Did Giddy Suffer Damages as a Result**

46.    Giddy's breach of contract claim stems from Kim's conditioned employment based on the signing of the employee handbook. [Doc. 66, p. 12]. Plaintiff admitted to said conditional signature. [Doc 1¶10]. Giddy told Kim it "was a routine contract that everybody signed." **EX. A**,

¶9; **EX. C**, 112: 15-16. With respect to the clauses at issue, non-disparagement and nonuse or disclosure, Giddy argues the subject tweets, attached as EX. C at BJ-4 to Giddy's Motion, stated Giddy forced employees to violate the shelter in place order, threatened to sue employees who contracted COVID, committed fraud and participated in racial discrimination. [Doc. 66, p. 12]. None of the tweets from Kim use the name "Giddy" or "Giddy Holdings, Inc." or any variation of Plaintiff's name. **EX. A**, ¶31. Moreover, Kim did not have access to confidential information or complex information regarding Plaintiff's product **EX. A**, ¶25; **EX. D**, 17:10-12, 113:15-23. Further, Plaintiff's marketing was not confidential because it is "a consumer facing communication" **EX. D**, 117:1-5. Kim "did not receive…confidential information other than the work that [he] needed to do and [he] did not divulge that information to anybody outside of Giddy." **EX. A**, ¶25; **EX. D**, 118:20-23. No social media posts were made by Kim on Giddy Holdings social media accounts nor did Kim tag Giddy Holdings social media accounts in the April 5, 2020 tweets which, again, can be determined on the face of the documents. **EX. A**, ¶31; **EX. D**, 122:4-20. Therefore, no confidential information could be disclosed because Kim did not have access to any such identifiable information.

47.     Moreover, any racial discrimination suffered by Kim due to Giddy's actions and statements outweighs restrain from painting Giddy in a "bad light" and certainly this notion is supported by Title VII of the Civil Rights Act. Giddy argues there was a breach of contract whereby Giddy essentially had a free pass to act however it pleased and the victim of said discrimination was bound to silence.

48.     Further, Kim testified he did not delete any company information. **EX. A**; **EX. C**. The affidavits of Giddy's IT personnel are not prima facie evidence that Kim deleted data. They are mere conclusory suspicions and Kim incorporates its objections to those herein.

49.     There is undoubtedly, at most, should this Court find Giddy's evidence credible, a fact issue created by the evidence on breach, element 2, of breach of contract.

50.     Kim incorporates Paragraph 45 of this Response with respect to Giddy's claim of conclusive damages proven. Because Giddy has not met its burden of proof on damages, and in the alternative out of abundance of caution, because there is at most a fact issue for the jury to decide if Giddy has been damaged, summary judgment should be denied.

**D.  There is No Evidence of Libel Per Se, and No Evidence of Damages Resulting**

51.     Federal district courts in Texas have opined that libel per se "means that written or printed words are so obviously hurtful to the person aggrieved by them that they require no proof of their injurious character to make them actionable." *Kirk v. Transport Workers Union*, 934 F. Supp. 775, 779, (S.D. Tex—1995). Should the words rise to the level of libel per se, Plaintiff need not prove its damages and are conclusively established. *Id*.

52.     The April 5, 2020 tweets made by Kim with respect to racial discrimination he endured from Giddy and regarding information of PPP loan fraud, were based on accurate information given to Kim by Giddy during his employment; Kim never threatened to reveal false information about Giddy. **EX. A**. Giddy made racially discriminatory remarks to Kim during his employment in relation to the COVID-19 crisis and therefore the tweets do not constitute imputing false acts on Giddy. **EX. A**, **EX. C**. Moreover, Kim submitted a bona fide complaint regarding PPP loan fraud with the FOIA that is pending.

53.     Lastly, in its Motion, Giddy does not even mention damages with respect to its libel per se claim, and therefore Giddy has not met its initial burden on this element or this cause of action, and summary judgment must be denied for this reason. In the alternative, out of abundance of caution, previously, Giddy has attempted to use its CEO's conclusory statements that it lost

investment funds from two investors as a result of the April 5, 2020 tweets due to their falsity. However, Kim points out that the testimony Giddy relies upon actually contains a statement from Mr. Jacobson that one investor pulled out "because of the litigation" or "potential litigation" "in the event of litigation as a result of the claims Mr. Kim was making." *See* **EX. E**, *Deposition of Brett Jacobson*, 72:15-73:4.

### E.   Giddy Cannot Meet Its Burden of Proof to Show Kim Allegedly Misappropriated Trade Secrets

54.   As previously stated in Kim's own Motion for Summary Judgment, it is indeed undisputed that Giddy owned certain trade secrets. However, Giddy continues to find ways to assert that Kim allegedly (1) acquired information (2) that equate to trade secrets, and (3) Kim then allegedly misappropriated trade secrets of Giddy—whereby none of the "three" ways Giddy alleges Kim did so actually meet the legal definition of "misappropriation." "Misappropriation" is defined as acquisition by improper means or the disclosure or use without consent. Tex. Civ. Prac. & Rem. Code Section 134A.002(3).

55.   Giddy first entirely fails to meet its summary judgment burden in that it fails to identify the specific information it believes Kim had that were trade secrets. In fact, the evidence shows Kim never had access to confidential information during his own employment with Giddy, and that Giddy never communicated or identified any confidential information exchange with Kim. **EX. D**. Should it be surmised that Giddy believes the alleged shared company data (it cannot show was deleted) during the factory reset of an employee laptop—including marketing data, vendor lists, contracts—was a trade secret, Texas case law has established that "there is no cause of action for misappropriation of confidential information that is not [] secret." *Adco Indus. v. Metro Label Corp*., LEXIS 5644, *9 (Tex. App.—Dallas 2000) (customer lists, pricing information, mailing tab packaging, identity of vendors was not trade secrets whereby the former employee would use

the same method/process in creating another marketing plan for a different company). Second, Giddy fails to show that any "trade secret" it believes was acquired was acquired through improper means. All information regarding discrimination was endured personally and all information shared about application for PPP loans was shared by Giddy in meetings with Kim during his employment.

56.     Lastly, Giddy believes that misappropriation occurred with respect to alleged inadvertently deleted data from shared drives, from screen shots of Kim's own company emails post termination, and the false statement that Kim personally reached out to investors publicly on Twitter. Again, any information shared on Twitter regarding PPP loan fraud was not a trade secret because it was not "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *Id*. It was also acquired properly during employment. **EX. C**, and it was never misappropriated. The alleged and unproven deleted company data was not even Kim's possession to disclose as any alleged result of the factory reset. Moreover, there is no indication any email, which Kim testified was only approval of use of funds during employment, was disclosed to anyone. Simply put there is absolutely no proof of misappropriation of any trade secret, and Giddy cannot meet its initial burden. The overwhelming evidence shows the information at issue, shows how it was acquired and shows nothing was disclosed to anyone improperly. Summary judgment must be denied on this issue.

**F.  Because Giddy's Argument for Misappropriation Fails, So to Must Its Argument for Breach of Fiduciary Duty.**

57.     Kim incorporates Section E of this Response herein. Giddy argues in its Motion that it has satisfied all elements for breach of fiduciary duty, and Giddy has identified the specific alleged breach---as an employee, Kim had a fiduciary duty "not to disclose its trade secrets." [Doc 66, p.

17]. Because Giddy has so closely woven its breach of fiduciary duty cause of action to its misappropriation of trade secrets action, and because Giddy failed to identify any specific trade secret that was divulged to Kim and failed to provide any evidence that such a trade secret was divulged/disclosed, this claim too must fail. There is no evidence offered in Section F or Section G of Giddy's Motion that purports to conclusively establish any trade secret was disclosed by Kim. By definition, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *Id*. There is no evidence of a trade secret and there is no evidence that even confidential information was disclosed. There is no evidence that Kim received a benefit as a result, not that Giddy identifies one in its Motion yet still seeks summary judgement. Kim incorporates its briefing from its own Motion for Summary Judgment, Section F, on damages element of this claim, as it has already been addressed.

### G. Giddy's Conversion Claim is Not Supported by Credible Evidence and the Burden Does Not Shift

58.     Giddy states in its Motion that Kim conceded in its own Motion for Summary Judgment as to first two elements of a conversion claim, and that it only needs to prove damages for summary judgment. [Doc. 66, p. 18]. Giddy cites to two paragraphs in Kim's Motion for Summary Judgment, one of which is the Conclusion and Prayer for the entire Motion, and no concessions is made therein. Giddy also refers to paragraph 53, but the paragraph expressly states Giddy has not provided any competent evidence of elements 2, 3, or 4, and therefore the only concession made was that Giddy owned the laptop. Because Giddy mischaracterizes the argument, it does not prove or attempt to prove the following required elements in that "the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; or that the plaintiff demanded return of the property; and

that the defendant refused to return the property." *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 759 (Tex. App.—Dallas 2008, no pet.). Kim incorporates his briefing, with respect to Giddy's inability to prove the damages element of its claim, from his Reply to Giddy's Response to Motion for Summary Judgment, Section F, and Motion for Summary Judgment.

## VI.
## <u>CONCLUSION AND PRAYER</u>

WHEREFORE, Defendant/Counter Plaintiff Ernest Kim respectfully requests that upon hearing, the Court (1) deny Giddy's Motion for Summary Judgment on all seven causes of action and grant Defendant all other relief, at law or in equity, to which it is justly entitled.

Respectfully submitted,

COWLES & THOMPSON, PC

By: _____
Casey S. Erick
Texas Bar No. 24028564
Email: cerick@cowlesthompson.com

901 Main Street
Suite 3900
Dallas, Texas 75202
Tel. (214) 672-2138
Fax. (214) 672-2338

**ATTORNEY FOR DEFENDANT ERNEST KIM**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 26, 2021, a copy of the foregoing was filed electronically using the Court's CM/ECF system and served in accordance with the Federal Rules of Civil Procedure. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept the electronic filing.

By: _____
Casey Erick

**KIM'S RESPONSE TO GIDDY'S MOTION FOR SUMMARY JUDGMENT**
**Page 21 of 22**