```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2                    AUSTIN DIVISION

 3    GIDDY HOLDINGS, INC,        ) Civil Action No.
                                  ) 1:20-cv-00434-LY
 4              Plaintiff,        )
                                  )
 5    VS.                         )
                                  )
 6    ERNEST KIM,                 )
                                  )
 7                                )
                                  )
 8              Defendant.        )

 9
    *************************************************************
10
              ORAL AND VIDEOTAPED DEPOSITION OF
11
                       ERNEST KIM
12
                   December 18, 2020
13
                       Volume 1
14
    *************************************************************
15      ORAL DEPOSITION OF ERNEST KIM, produced as a

16  witness at the instance of the Plaintiff, and duly

17  sworn, was taken in the above-styled and -numbered cause

18  on the 18th day of December, 2020, from 9:00 a.m. to

19  4:10 p.m., via video conferencing, before Deborah Renee

20  Quarles, Notary for the State of Texas, reported by

21  machine shorthand, remotely from Johnson County, Texas,

22  pursuant to the Texas Rules of Civil Procedure, the

23  Texas Supreme Court Emergency Order Regarding the

24  Covid-19 State of Disaster, and the provisions stated on

25  the record or attached hereto.
```

U.S. LEGAL SUPPORT, INC
713-653-7100

EXHIBIT C

1     A.   No.
2     Q.   Did you search for documents for today's
3  deposition?
4     A.   No.
5     Q.   Do you have any documents in your possession
6  from your employment with Giddy?
7     A.   No.
8     Q.   Do you have any documents in your possession
9  that relate to your defenses to Giddy's claims or your
10 counter claim?
11           (Simultaneous speaking interruption).
12           MR. ERICK:  Object to form, sorry.
13           THE WITNESS:  Yes.
14    Q.   (BY MR. STOKER)  Are you able to explain what
15 those documents are?
16    A.   Screen shots of Brett Jacobson's approval for
17 marketing budget to be spent, my offer letter --
18 amendment to offer letter.
19    Q.   Anything else?
20    A.   And letters I received from your office, as
21 well as from Mr. Clark.
22    Q.   Do you have any e-mails from your employment
23 with Giddy?
24    A.   No.  Other than screen shots to -- other than
25 screen shots, no.

1  Q. Those screen shots are from your phone?
2  A. Yes.
3  Q. How did you access the e-mails that you took
4  screen shots of?
5  A. I took screen shots when I was accused of
6  spending marketing budgets that she didn't approve of.
7  Q. And when was that? When were you accused of
8  spending marketing funds that weren't approved?
9  A. I don't remember.
10 Q. Was it during your employment?
11 A. No.
12 Q. After you were terminated from Giddy, you were
13 accused of spending marketing funds that weren't
14 approved?
15 A. Yes.
16 Q. And at that time you took screen shots of
17 e-mails?
18 A. Yes.
19 Q. And these screen shots were from your phone?
20 A. Yes.
21 Q. How did you access the e-mails that you took
22 screen shots of?
23 A. It was in my phone.
24 Q. Your Giddy e-mail was on your phone?
25 A. Yes.

1    Q.  And it stayed on your phone after your
2    employment?
3    A.  Yes.
4    Q.  Is it still on your phone?
5    A.  No.
6    Q.  What happened to it?
7    A.  I removed the account.
8    Q.  What was the account name?
9    A.  I don't recall.
10   Q.  Was it a Gmail account?
11   A.  No.  It was a company e-mail account.
12   Q.  So the app on your phone was a -- was it like
13   an Outlook mail app?  What was it?
14   A.  It was an Apple iPhone mail app.
15   Q.  Okay.  And that phone that had the Apple app on
16   it, is that the same phone that you currently have?
17   A.  Yes.
18   Q.  Do you recall when you deleted that app?
19   A.  I don't know that exactly.
20   Q.  Did somebody tell you to delete it?
21   A.  No.
22   Q.  Did you take screen shots of all the e-mails in
23   that account?
24   A.  No.
25   Q.  Just select e-mails?

1   A.   Yes.
2   Q.   What -- how did you decide which e-mails to
3   take screenshots of?
4   A.   Only the ones that I was being accused.
5   Q.   And that's the marketing budget e-mails?
6   A.   Yes.
7   Q.   Did you -- and you still have those screen
8   shots in your possession, correct?
9   A.   No; I gave it to my attorney.
10  Q.   Did you take screen shots of any -- that
11  contained any Giddy confidential information?
12  A.   No.
13  Q.   Other than the e-mails on your phone, did you
14  search any personal devices for e-mails pertaining to
15  the claims against you or the claims that you have
16  against Giddy?
17  A.   Could you elaborate on that?
18  Q.   Did you search -- let's go through this.
19            What personal computer devices do you have
20  in your home?
21  A.   I have my laptop in my home.
22  Q.   Do you have a PC?
23  A.   Yes.
24  Q.   Do you have a tablet?
25  A.   No.

1        A.   Yes.
2        Q.   Is Ty that IT person?
3        A.   Yes.
4        Q.   And is that who gave you this information along
5   with Kristen?
6        A.   He didn't give me this information.  I think he
7   just set it up.
8        Q.   Okay did you get the information from Kristen?
9        A.   I don't remember.
10       Q.   Did you get any training on any of this IT
11  stuff?
12       A.   No.
13       Q.   Did you get training on how to log in to the
14  network?
15       A.   No.
16       Q.   Did someone explain to you how to log in to the
17  network?
18       A.   No.
19       Q.   Did someone explain to you how to log in to the
20  network?
21       A.   I believe so.
22       Q.   Do you know who that was?
23       A.   I think it was Ty.
24       Q.   And Ty went through how to log in and showed
25  you where things are?

1     A.   For the e-mail, yes.
2     Q.   Okay.  What was that -- how did you sign into
3 the Giddy e-mail?
4     A.   He told me to -- I don't remember.  I think he
5 created an e-mail account and told me to sign in.
6     Q.   Okay.  So you had a Giddy laptop?
7     A.   At that point, yes.
8     Q.   Okay.  So when --  did you get that the first
9 day?
10     A.   I believe so.
11     Q.   Ty showed you how to log into that Giddy laptop
12 or explained to you?
13     A.   No.
14     Q.   But you were able to log into that laptop?
15     A.   Yes.  No -- let me rephrase.  It was a brand
16 new laptop where I could create my own login.
17     Q.   Okay.  So what login did you create?
18     A.   I use that same login that was on my phone
19 using Apple ID.
20     Q.   That Apple app that we talked about earlier?
21     A.   No.  Using -- so when you create an Apple
22 laptop, based on my recollection, you create your own
23 user ID, your own password, and then it ask you, "do you
24 want to create a new Apple ID or use an existing one?"
25 So rather than having to remember two, I used my

1  account?
2      A.  Yes.
3      Q.  So that's where all your e-mails were?
4      A.  Yes.
5      Q.  Giddy?
6          How about documents?  Where are documents
7  stored for Giddy?
8      A.  In the cloud, Google Doc.
9      Q.  Was that Google Doc tied to your Gmail account?
10     A.  No.
11     Q.  Giddy Gmail account?
12     A.  Yes; Giddy Gmail account.
13     Q.  Okay.  Was there another shared drive that you
14  used with your employment?
15     A.  No.
16     Q.  Was there an Apple cloud that was used?
17     A.  No.
18     Q.  So all the documents that you used were either
19  on the Google Cloud or in your e-mail?
20     A.  Correct.
21     Q.  Okay.  Did you, during your employment, save
22  documents on the physical laptop?
23     A.  No.
24     Q.  You didn't save anything on the hard drive of
25  the laptop?

1    A.   The photos.

2    Q.   Okay.  What were those photos?

3    A.   Marketing photos.

4    Q.   Of Giddy's product?

5    A.   No; background photos.

6    Q.   Background photos?

7    A.   Yes.

8    Q.   Okay.  Anything else that would have been saved
9 on the laptop?

10   A.   No.

11   Q.   Okay.

12        MR. STOKER:  We talked about taking a
13 break; so if it's good with everybody, we can take a
14 15-20 minute break here and come back.

15        MR. ERICK:  What do you say?  11:30 back
16 on?

17        MR. STOKER:  That'll work.

18        THE VIDEOGRAPHER:  Okay.

19        Off the record at 5:14 p.m. GMT -- 11:14
20 a.m. CST.

21        (Break taken from 11:14 a.m. to 11:32 a.m.)

22        THE VIDEOGRAPHER:  We are on the record at
23 5:32 p.m. GMT -- 11:32 a.m. CST.

24   Q.   (BY MR. STOKER)  Mr. Kim, are you prepared to
25 continue with the deposition?

1  recall today do not even allow you to even mention their
2  names; but when you were hired by Giddy, you did not
3  read the documents they gave you?
4      A.  I skimmed through but I didn't read them; and I
5  don't understand the technical details of these legal
6  languages --
7      Q.  Okay.
8      A.  -- So I asked what this document was.  They
9  said, "Something everybody signs, sign here."  So that's
10 what I did.
11     Q.  On the first page of the document, it says
12 confidentiality and it says company confidential
13 information.  Do you see that?
14     A.  Yes.
15     Q.  Did you understand that working with Giddy as
16 chief marketing officer, you had access to the company's
17 confidential information?
18     A.  I don't have access to the company's
19 confidential information.
20     Q.  Did you understand that you would have access
21 to information related to Giddy's product?
22     A.  I didn't have access to any information about
23 the product.
24     Q.  Did you have access to Giddy's information
25 about Giddy's marketing plans?

1      A.   There were no marketing plans.
2      Q.   Mr. Kim, it was your responsibility to do
3  marketing for Giddy, correct?
4      A.   Yes, I created the marketing plans.  Before I
5  joined, there wasn't any.
6      Q.   You're saying there were no marketing efforts
7  for Giddy prior to your start?
8      A.   There was marketing effort; but there was no
9  marketing plans.
10     Q.   You were provided information about those
11 marketing efforts; correct?
12     A.   Which efforts?
13     Q.   About the marketing efforts of Giddy.
14     A.   Very high-level view, yes.
15     Q.   As chief marketing officer, in order to market
16 the products, don't you need to know about the product?
17     A.   Yes.
18     Q.   So you were provided information about the
19 product?
20     A.   Very-high level product that's available on the
21 website.  Yes.
22     Q.   I'm not asking you to tell me today if you deem
23 it confidential or not.  Because you already told me you
24 don't have the legal expertise to do that.  I'm just
25 asking for you to confirm as being hired as chief

1  possession on April 13, 2020?
2       A.   I don't know if I did or when I returned it.
3       Q.   Okay.  The picture above here is an e-mail.  Is
4  that from your Gmail account, Ernie Kim?
5       A.   Yes, yes it is.
6       Q.   And it seems to be a screen shot of a FedEx.
7       A.   Yes.
8       Q.   Do you recall going to Federal Express --
9       A.   Yes.
10      Q.   -- April 13th?
11      A.   I don't know the date; but if that's when I
12  went, yes.
13      Q.   Okay.  And if you look at the -- the picture
14  of receipt there --
15      A.   Yes.
16      Q.   -- I think this date of April 13th.  Do you see
17  that?
18      A.   Yes.
19      Q.   Okay.  So is this a receipt of your FedEx
20  package with Giddy property being sent back?
21      A.   Yes.
22      Q.   Okay.  So you did have Giddy property on April
23  13th, 2020?
24      A.   Yes.
25      Q.   Okay.  If we go back to the beginning of the

1      A.   I think so.
2      Q.   Okay.  So sometime after April 13th, you still
3  had access to those e-mails?
4      A.   Access through Gmail?  No.
5      Q.   You had access to them on your phone?
6      A.   Yes.
7      Q.   Okay.  So you were not able to mail the
8  property back because of the quarantine order?
9      A.   Yes.
10     Q.   But you did anyway.
11     A.   Because they threatened to take legal action
12  according to that letter.
13     Q.   Did you -- after you were notified that you
14  were terminated, did you go on to the MacBook?
15     A.   Yes.
16     Q.   And what did you do on the MacBook?
17     A.   I wanted to remove or de-link my Apple ID from
18  the laptop.
19     Q.   Did you do that?
20     A.   I couldn't figure it out.
21     Q.   Okay.  What about the documents that were
22  maintained on that laptop?  Did you make a copy of
23  those?
24     A.   No.  I think I told you earlier that all the
25  documents are on the Cloud.

```
 1  laptop?
 2       A.   What do you mean by link to the e-mail?
 3       Q.   Did you delete -- did you reset the computer?
 4       A.   Yes.
 5       Q.   Okay.  Factory reset?
 6       A.   Yes.
 7       Q.   Okay.  Why did you do that?
 8       A.   I couldn't unlink my Apple ID to the laptop.
 9       Q.   Did you contact anyone at Giddy asking how to
10  do that?
11       A.   No.
12       Q.   You understood by resetting the computer would
13  lose all the information that was on there, right?
14               MR. ERICK:  Objection.  Form.
15               THE WITNESS:  There is no information
16  physically on the laptop.  All the work we do are on the
17  Cloud.
18       Q.   (BY MR. STOKER) Did you contact Giddy to ask if
19  you should to reset the computer?
20       A.   No.
21       Q.   How did you figure out how to reset the
22  computer?
23       A.   I looked it up on YouTube.  Google first.
24       Q.   And what did you do to reset it?
25       A.   I don't have the exact process.  They said you
```

1  cannot uncouple the Apple ID.  So you have -- in order
2  to -- the only way to do it is I have to do the
3  manufacturer's resetting.
4        Q.   And did the information you Googled explain
5  that it would take everything off the computer that was
6  on there?
7        A.   There was nothing on the computer.  It was on
8  the Cloud.
9        Q.   Did you understand that hard drive would be
10 gutted if you reset the computer?
11       A.   Hard drive will be the same format as the way
12 it is when I was working there, yes.
13       Q.   So but anything that was saved on the hard dive
14 would be gone?
15            MR. ERICK:  Objection.  Speculation.
16            THE WITNESS:  There's nothing on the hard
17 drive that's related to Giddy.  Everything was on the
18 Cloud.
19       Q.   (BY MR. STOKER)  Well, were you responsible for
20 IT at Giddy?
21       A.   No.
22       Q.   Do you know what sorts of firewalls they had?
23       A.   No.
24       Q.   Or backups on the laptop?
25       A.   No.

1  investors?
2      A.  There were a couple names, yes.
3      Q.  Okay.  And were you, as part of your marketing
4  efforts, directed to contact the potential investors?
5      A.  Potential investors?
6      Q.  Yes.
7      A.  No.
8      Q.  I want to go back to Exhibit 12 for just a
9  second.
10     A.  Okay.
11     Q.  You have seen this before and we talked about
12 your response.  And in the first sentence of -- I guess
13 it's the second sentence, you mentioned a wrongful
14 termination?
15     A.  Yes.
16     Q.  Do you see that?  Did you believe you were
17 terminated at that time?
18     A.  Because -- no -- what I found out was -- my --
19 I didn't have access to anything -- to the company.
20     Q.  It was your -- when you put wrongful
21 termination -- do you believe that you no longer had a
22 job with Giddy?
23     A.  Based on my assumption, yes.
24     Q.  So on your laptop that was reset after your
25 employment, you said that there's nothing on the hard

```
 1   drive?
 2              MR. ERICK:  Objection to form.  Misstates
 3   testimony.
 4              THE WITNESS:  No.
 5       Q.  (BY MR. STOKER) You did not save documents on
 6   the hard drive?
 7       A.  No.
 8       Q.  Okay.  Did you provide marketing presentations
 9   for Giddy?
10       A.  Marketing presentations?  Can you elaborate?
11       Q.  Did you do marketing presentations for Giddy?
12       A.  No.
13       Q.  No?  Did you have marketing campaign documents?
14       A.  What type of marketing campaign documents?
15       Q.  It was your job to start the marketing
16   strategy, correct?
17       A.  Yes.
18       Q.  Did you prepare documents related to that
19   strategy?
20       A.  Yes.  On -- (inaudible) drive.
21       Q.  None of those were saved on the hard drive of
22   the laptop?
23       A.  No; they're all in the Cloud.
24       Q.  How about proposals for contracts?  Did you do
25   those during your employment with Giddy?
```

1    A.   Proposals for contracts with who?
2    Q.   Did you receive proposals for contracts related
3 to your marketing efforts?
4    A.   From who?
5    Q.   In general.
6    A.   For a vendor?  Yes.
7    Q.   Okay.  And did you save those someplace?
8    A.   In the cloud.
9    Q.   Okay.  How about contracts for marketing?  Did
10 you see --
11    A.   In the Cloud.
12    Q.   And you put those in the Cloud?
13    A.   It's all in the contract it's on their
14 DocuSign; so it's on the cloud.
15    Q.   Okay.  And you never saved those on your
16 laptop?
17    A.   No.
18    Q.   Okay.  So if we were missing a contract that
19 you signed and it's not on the drive, do you have any
20 idea where we would look to find them?
21    A.   I don't -- I'm not aware of any contracts that
22 I signed besides the Edge Media.
23    Q.   How about proposals you received?  If those are
24 missing?
25    A.   It should be in the e-mail, which is also in

1  the Cloud.
2      Q.  And how do you know that e-mail is in the
3  Cloud?
4      A.  Because we use Gmail.
5      Q.  What does that mean?
6      A.  Whether you're using Gmail or Outlook, you
7  don't download your individual e-mail.  Everything is in
8  the e-mail server.  That you could access.
9      Q.  How would you have that knowledge?
10     A.  That is the general knowledge.
11     Q.  So that's general knowledge.
12     A.  Yes.
13     Q.  Is having a fever as a COVID-19 symptom general
14  knowledge?
15          MR. ERICK:  Objection.  Form.  Speculation.
16          THE WITNESS:  I don't know.  I don't know
17  if everybody's aware of it.
18     Q.  (BY MR. STOKER) So you're certain that's
19  general knowledge?  That Gmail is in the cloud?
20     A.  Yes.
21     Q.  Okay.  If we were looking for your marketing
22  campaign documents and they're not in the Cloud, do you
23  have any suggestions about where they would be?
24     A.  No, they are all in the Cloud.  We use a
25  collaboration tool.  They're in the cloud.