```
 1              UNITED STATES DISTRICT COURT
                 WESTERN DIVISION OF TEXAS
 2                    AUSTIN DIVISION

 3

    GIDDY HOLDINGS, INC.           )
 4                                 )
    VS.                            ) CIVIL ACTION NO.
 5                                 ) 1:20-CV-00434-LY
    ERNEST KIM                     )
 6

 7

 8

 9

10

11

12      ----------------------------------------------

13             DEPOSITION OF ERNEST KIM

14                APPEARING REMOTELY

15             FRIDAY, APRIL 2, 2021

16      ----------------------------------------------

17          ORAL DEPOSITION OF ERNEST KIM, produced as

18  a witness at the instance of the Plaintiff, and duly

19  sworn, was taken in the above-styled and -numbered cause

20  on the 2nd day of April, 2021, from 9:03 a.m. to 10:08

21  a.m., remotely before Natasha Duckworth, a CSR in and

22  for the State of Texas, reported by machine shorthand at

23  Collin County, Texas, pursuant to the Texas Rules of

24  Civil Procedure and the provisions stated on the record

25  or attached hereto.
```

Page 2

```
 1              REMOTE APPEARANCES
 2
 3  FOR THE PLAINTIFF:
 4     MR. M. WILSON STOKER
        COKINOS YOUNG
 5      900 S. Capital of Texas Highway
        Las Cimas IV, Suite 425
 6      Austin, Texas  78746
        Telephone:  512.615.8573
 7      Facsimile:  512.610.1184
        E-mail:  Wstoker@cokinoslaw.com
 8
 9
    FOR THE DEFENDANT:
10
       MR. CASEY S. ERICK
11     COWLES & THOMPSON, P.C.
       901 Main Street
12     Suite 3900
       Dallas, Texas  75202
13     Telephone:  214.672.2000
       Facsimile:
14     E-Mail:  Cerick@cowlesthompson.com
15
16  ALSO PRESENT:
17     Lauren Aldredge
18
19
20
21
22
23
24
25
```

Page 3

```
 1                   I N D E X
 2
    PROCEEDINGS                              PAGE
 3
    Appearances.................................  2
 4
    Stipulations................................  5
 5
    ERNEST KIM
 6    Examination by Mr. Stoker.................  6
 7  Reporter's Certificate...................... 41
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1         REPORTED REMOTELY FROM COLLIN COUNTY, TEXAS
 2                   FRIDAY, APRIL 2, 2021
 3
 4            THE VIDEOGRAPHER:  We are now on the
 5  record.  Participants should be aware that this
 6  proceeding is being recorded and, as such, all
 7  conversations held will be recorded unless there is a
 8  request and agreement to go off the record.  Private
 9  conversations and/or attorney-client interaction should
10  held outside the presence of the remote interface.
11            For the purpose of creating a witness-only
12  video recording, the witness is being spotlighted or
13  locked on all video screens while in speaker view.  We
14  ask that the witness not remove the spotlight setting
15  during the deposition as it may cause other participants
16  to appear on the final video rather than just the
17  witness.  For anyone who doesn't want the witness's
18  video to take up the large portion of your screen, you
19  might click the gallery view button in upper right
20  corner of the remote depo interface.
21            This is the remote video-recorded
22  deposition of Ernest Kim.  Today is Friday, April 2nd,
23  2021.  The time is 2:03 p.m. GMT, 9:03 a.m. CST.  We are
24  here in the matter of Giddy Holdings, Inc. versus Ernest
25  Kim.  My name is Ciara Vij, remote video technician on
```

Page 5

```
 1  behalf of US Legal Support located at 4801 Northwest
 2  Loop 410, Suite 375, San Antonio, Texas 78229.  I'm not
 3  related to any party in this action, nor am I
 4  financially interested in the outcome.
 5            At this time will the reporter on behalf of
 6  US Legal Support please enter the statement for remote
 7  proceedings into the record.
 8            THE REPORTER:  The attorneys participating
 9  in this deposition acknowledge that I am not physically
10  present in the deposition room and that I will be
11  reporting this deposition remotely.  They further
12  acknowledge that, in lieu of an oath administered in
13  person, I will administer the oath remotely.  This
14  agreement is pursuant to the Texas Supreme Court Order
15  Regarding the Covid-19 State of Disaster.  The parties
16  and their counsel consent to this arrangement and waive
17  any objections to this manner of reporting.
18            Please indicate your agreement by stating
19  your name and your agreement on the record.
20            MR. STOKER:  Wilson Stoker on behalf of
21  Giddy Holdings and we agree.
22            MR. ERICK:  Casey Erick on behalf of the
23  defendant.  Agreed.
24            (The witness was sworn by court reporter.)
25            ERNEST KIM,
```

Page 6

1  having been first duly sworn, testified as follows:
2                      EXAMINATION
3  BY MR. STOKER:
4     Q.   Good morning, Mr. Kim.
5     A.   Morning.
6     Q.   Last time we met was I think December 18th,
7  2020, and we went through some ground rules for the
8  deposition.  Do you recall those?
9     A.   Some of them, yes.
10    Q.   Okay.  Can we proceed under the same rules
11 today?
12    A.   Yes.
13    Q.   Okay.  Is there anything that will prevent you
14 from testifying truthfully today?
15    A.   No.
16    Q.   Have you ever been diagnosed with mental
17 illness?
18    A.   No.
19    Q.   Have you ever seen a doctor for mental
20 disorders?
21    A.   No.
22    Q.   Do you have memory issues?
23    A.   No.
24    Q.   Taking medication for memory issues?
25    A.   No.

Page 7

1     Q.   Okay.  When we last spoke, we went through a
2  lot of back and forth about all these
3  confidentiality/nondisclosure agreements that prevented
4  you from testifying on several questions.  Were you able
5  to locate any nondisclosure agreements that you were
6  testifying to?
7     A.   No.
8     Q.   Were you able to locate any confidentiality
9  agreements that you --
10    A.   No.
11    Q.   -- testified about?  No?
12    A.   No.
13    Q.   Were you able to locate any agreements with
14 your former employers that prevents you from testifying
15 today?
16    A.   No.
17    Q.   Were you able to locate any agreements that
18 prevent you from testifying about former clients or
19 vendors today?
20    A.   No.
21    Q.   Where did you search for agreements?
22    A.   I searched on -- in my e-mail inbox.
23    Q.   And what e-mail was that?
24    A.   Gmail.
25    Q.   Any other e-mails?

Page 8

1     A.   I also looked at Yahoo as well.
2     Q.   Did you search your hard drive?
3     A.   Yeah, I did.  I don't have any files from my
4  previous companies.
5     Q.   Did you search in your house for hard -- for
6  hard copies of documents?
7     A.   We don't -- I don't have any hard copies of
8  Word documents.
9     Q.   Okay.  Did you search for your severance
10 agreement with General Motors?
11    A.   Yes, I have.
12    Q.   And you didn't find it?
13    A.   About client confidentiality, no.
14    Q.   Did you -- do you have your severance agreement
15 from General Motors?
16    A.   Yes, I do.  I sent it to my attorney.
17    Q.   Okay.  You also testified on December 18th,
18 2020, about filing a complaint with the Small Business
19 Association.  Do you recall that?
20    A.   Yes.
21    Q.   Were you able to locate that complaint?
22    A.   No.
23    Q.   You also testified about filing a complaint
24 about Giddy with the Attorney General's office.  Were
25 you able to find that complaint?

Page 9

1     A.   No.
2     Q.   Do you believe you filed a complaint with the
3  Attorney General's office?
4     A.   Yes, I have.
5     Q.   But you have no record of that complaint?
6     A.   I -- I don't remember if they sent me anything.
7     Q.   Did you file it anonymously?
8     A.   Yes, I have.
9     Q.   What -- how did you go about filing that
10 complaint?
11    A.   I believe it was online.
12    Q.   And you filled out a form online?
13    A.   It's been a long time, so I don't remember if
14 it was a form or an e-mail.  I don't remember.
15    Q.   What was the content of your complaint
16 regarding Giddy Holdings?
17    A.   I -- to be honest, I don't remember.  I don't
18 remember the details.
19    Q.   Well, you would agree that filing a complaint
20 with the Attorney General's office is a serious issue.
21    A.   Yes.
22    Q.   So there must have been something that was
23 concerning to you, concerning enough to contact the
24 Attorney General's office.
25    A.   Yes.  The nature of -- I don't have the

Page 10
1  details, but the nature of the complaint is how they
2  were -- they Giddy was trying to fudge numbers so that
3  they're able to qualify for a larger PPP loan.
4       Q.   And you already testified last time that you
5  were not responsible for filing anything with the Small
6  Business Association on behalf of Giddy.  Correct?
7       A.   After I declined to help out, I was not
8  involved in any of them.
9       Q.   Well, I don't want to rehash all your
10 testimony, but you were the marketing director for
11 Giddy.  Correct?
12      A.   Chief marketing officer.
13      Q.   Okay.  And as chief marketing officer, it was
14 not your job to submit documents for the PPP.
15      A.   Correct.
16      Q.   And you didn't do that on behalf of Giddy.
17      A.   No, I didn't.
18      Q.   And you weren't even employed when Giddy
19 received its PPP loan.  Correct?
20      A.   I was employed when they applied for the PPP
21 loan.
22      Q.   But you were not -- you were not employed when
23 they received whatever they received back?
24      A.   Correct.
25      Q.   Okay.  So you have no firsthand knowledge of

Page 11
1  what was submitted to the SBA for the PPP loan?
2       A.   I have the firsthand knowledge of what Brett
3  said he was going to submit to get more money.
4       Q.   In the conference call that we talked about?
5       A.   Conference call and separate conversations with
6  me.
7       Q.   Did you see a document that he submitted?
8       A.   No.
9       Q.   Did you watch him submit something?
10      A.   No.
11      Q.   And so this unanimous complaint was filed with
12 the Texas Attorney General's office?
13      A.   I believe so.
14      Q.   And is there a separate anonymous complaint
15 with the SBA?
16      A.   As with SBA or IC unit, it was not an unanimous
17 complaint.
18      Q.   Okay.  And you weren't able to locate a copy of
19 that?
20      A.   No.
21      Q.   Did you contact SBA about that?
22      A.   No.  There's a complaint or filing or file
23 number I think I received and gave it to my attorney.
24      Q.   Okay.  So, you know, it's been three-and-a-half
25 months and we clearly asked for whatever information you

Page 12
1  have on this complaint.  Did you call the SBA to see if
2  you can get a copy your complaint?
3       A.   No.
4       Q.   Did you do anything to try to get a copy of
5  that complaint?
6       A.   No.
7       Q.   What was the content of that complaint?
8       A.   Similar as I mentioned.
9       Q.   Any reason you filed two complaints with the
10 same content?
11      A.   Can you clarify?  Two complaints with where?
12      Q.   So my understanding is that you have filed a
13 complaint with the Attorney General's office.
14      A.   Yes.
15      Q.   And a separate one with the SBA.
16      A.   Yes, correct.
17      Q.   Okay.  So that's two.  And my understanding is
18 they both have similar content.
19      A.   Correct.
20      Q.   But why did you file two complaints about the
21 same incident?
22      A.   Because the SBA oversees all the fraudulent PPP
23 applications.
24      Q.   Okay.  Okay.  We also talked a lot about your
25 employment history.

Page 13
1       A.   Yes.
2       Q.   You know, income history.  And I want to just
3  clarify some -- some of your involvement in different
4  areas so that I'm clear on this.
5       A.   Okay.
6       Q.   So one company that your name comes up with is
7  called Cootdiu.  Are you familiar --
8       A.   Correct.
9       Q.   What is Cootdui?
10      A.   It's a start-up company similar to Yelp or
11 Glescor.
12      Q.   Okay.  And when did you -- are you an owner of
13 that, a founder of that?
14      A.   I'm a cofounder of it.
15      Q.   When did you start that?
16      A.   August of last year.
17      Q.   Of 2020?
18      A.   Yes.
19      Q.   All right.  And you have partners?
20      A.   Yes.
21      Q.   Who are they?
22      A.   Alex -- I cannot pronounce his name.  He's from
23 Ukraine and we have Edward from Thailand.
24      Q.   Okay.  Have you received any income from this
25 business?

Page 30

1   Q.   I have on the screen what I believe was marked
2   as Exhibit 2 in our prior deposition.
3   A.   Yes.
4   Q.   And this is your resumé.  You agree?
5   A.   Yes.
6   Q.   Okay.  And we had some discussion about lots of
7   this, but what I'd like to talk about right now is the
8   "Achievement" section that we talked about last time.
9   A.   Sure.
10  Q.   So in here, you have several representations
11  about prior work and I wanted to talk just about a
12  couple to see if we can identify the information that we
13  were trying to -- trying to get at last time.
14  A.   Sure.
15  Q.   At the bottom of this "Achievement" section,
16  which I have pulled up on the screen, says, "interim
17  chief marketing officer for a $1 billion client."  Do
18  you see that?
19  A.   Yes.
20  Q.   So who was the $1 billion client?
21  A.   I believe it was American Eagle.
22  Q.   The retailer?
23  A.   Yes.
24  Q.   And when did do you work for them?
25  A.   I believe it was sometime in 2017 when we did

Page 31

1   their marketing assessment.
2        MR. ERICK:  Hold on a sec.  Can everybody
3   hear me?
4        THE WITNESS:  Yes.
5        MR. ERICK:  Okay.  Were there questions
6   asked when I wasn't online?
7        MR. STOKER:  No.
8        MR. ERICK:  Just this first one?
9        MR. STOKER:  Correct.
10       MR. ERICK:  Okay.  All right.  I got kicked
11  off for some reason.
12       MR. STOKER:  Yeah, we waited for you.
13       MR. ERICK:  Okay, great.  Okay.
14  Q.   (BY MR. STOKER)  So Mr. Kim, we were talking
15  about American Eagle 2017.  Were you -- you said we.
16  Who is "we?"
17  A.   A company that I was working for Booz &
18  Company.  We do -- we went and did marketing assessment
19  shortly after their CEO -- the chief marketing officer
20  left.
21  Q.   Okay.  So American Eagle had an agreement with
22  Booz & Company?
23  A.   Correct.  No, PwC.
24  Q.   So at that point it was PwC?
25  A.   Correct.

Page 32

1   Q.   And your group worked with American Eagle?
2   A.   Yes.
3   Q.   How long did that relationship last?
4   A.   Several months.
5   Q.   Okay.  And your title was chief marketing
6   officer with them?
7   A.   No.  We work on a project.  So the nature of
8   work is sometimes very often when the chief marketing
9   officer is not there, we play the role of putting the
10  strategy in place, building out the road map and so
11  forth.
12  Q.   You as an individual were not the chief
13  marketing officer?
14  A.   I was the lead for the marketing work that we
15  were doing.  So they asked me to play that role.
16  Q.   And what did you do to play that role?
17  A.   Do what was initially designed, asked us to do.
18  Look at the overall marketing spent, identify areas
19  where there could be improvements, and make
20  recommendations and also help them out with CMO search.
21  Q.   Okay.  The next line under that says, "interim
22  chief marketing officer for a $3.8 billion client."
23  A.   Yes.
24  Q.   Who is that client?
25  A.   Trukindo in Indonesia.

Page 33

1   Q.   What did you do for them?
2   A.   They never had a marketing organization so we
3   were building that marketing organization.  So similar
4   role.  I was in charge of building a marketing
5   organization, building out capabilities, building
6   processes and tasks, building the marketing
7   organizational structure, KPIs.  So I ended up playing
8   the CMO role during that project --
9   Q.   When was --
10  A.   -- until they assigned -- until they assigned a
11  proper CMO.
12  Q.   Okay.  And when -- when did you have this
13  relationship?
14  A.   From 2011 until 2015.
15  Q.   You as an individual were the interim chief
16  marketing officer?
17  A.   I was asked to play that role, yes.
18  Q.   Were you given that title?
19  A.   Given the title so that company is made an
20  announcement, no.
21  Q.   You were a consultant?
22  A.   Yes.
23  Q.   Not an employee?
24  A.   Correct.
25  Q.   You were not an employee of American Eagle?

Page 34

1   A.   No.
2   Q.   Was that relationship the most recent one with
3   the $3.8 billion client with Booz & Company or PwC?
4   A.   I think it was Accenture if I remember
5   correctly.
6   Q.   So at the time you were an employee of
7   Accenture?
8   A.   Yes.
9   Q.   Where your title was head of -- I don't know
10  it.
11  A.   ASEAN.
12  Q.   ASEAN product sales and marketing?
13  A.   Yes.
14  Q.   But that was part of your job at Accenture?
15  A.   Yes.
16  Q.   Interim head of marketing for a $3.3 billion
17  client is the next line and that was in 2013.  What
18  client was that?
19  A.   I actually do not remember which client that
20  is.  My assumption is that it's a Miwom.  It's a company
21  called Miwom.
22  Q.   And that -- that role was part of your job at
23  Accenture again?
24  A.   Yes.
25  Q.   And were you given the title with that company,

Page 35

1   head of marketing?
2   A.   No.
3   Q.   Were you an employee of that company?
4   A.   No.
5   Q.   Do you remember the 2.2 billion client from
6   2012?
7   A.   I believe that was Visa if I remember
8   correctly.
9   Q.   Okay.  And were you an employee of Visa?
10  A.   No.
11  Q.   You were working as an Accenture employee at
12  that time.
13  A.   Correct.
14  Q.   A little bit above in the "Achievement"
15  section, there is a line that says "16 clients with
16  successful turnaround brands?"
17  A.   Yes.
18  Q.   Can you, first of all, explain to me what a
19  successful turnaround brand is?
20  A.   Successful meaning company is -- their brand
21  value is going down or a brand is no longer capturing
22  what we call cap of mind when somebody wants to -- for
23  example, let's say you want to buy a PC.  What brand
24  comes to your mind?  You might say Dell, Lenovo, and so
25  forth.  So when company is no longer considered top

Page 36

1   three, we consider them to be lagging.  So how do you
2   bring them to come back to the top consideration.
3   Q.   And when you successfully turn them around,
4   that's an achievement.
5   A.   Correct.
6   Q.   So is it fair to say that you're saying in this
7   line to someone who understands marketing that you've
8   done that for 16 clients?
9   A.   Yes.
10  Q.   Okay.  Are you able to recall any of those 16
11  clients that you did that for?
12  A.   The Trukindo is one of them.  Intel is one of
13  them.  I worked on Levis a long time ago, so that's
14  another one.  Now they are considered, you know, a lot
15  more recognizable, especially in international markets,
16  yes.
17  Q.   All right.  Did you receive any response to the
18  SBA complaint that you filed?
19  A.   I received a phone call with an in-depth
20  interview and that was it.
21  Q.   Was that around the same time you filed the
22  complaint?
23  A.   Maybe a week after, maybe two weeks after.  I
24  don't -- I don't know the exact time when they called.
25  Q.   You don't have that person's information?

Page 37

1   A.   He said he's -- he went by -- he said he's a
2   special agent bearer.
3   Q.   Did he give you a badge number or a card or any
4   information?
5   A.   No.
6   Q.   How about with the Attorney General's office?
7   A.   No, no response.
8   Q.   Never got any -- any confirmation that you
9   filed or anything?
10  A.   When you submit, there was a confirmation on
11  the website, but no.
12  Q.   You don't have a confirmation e-mail?
13  A.   I don't think so.
14  Q.   Did you search for that?
15  A.   Yeah, I did.
16  Q.   All right.  So in the last few months we've
17  asked for some witness contact information that you
18  mentioned and I just want to take this opportunity to go
19  through who you've reached out to or talked to get their
20  information.  Eric Taylor.  Have you spoken with Eric
21  about this case?
22  A.   Yes.  I sent mailing address to my attorney.
23  Q.   Great.  Thank you.  How about Jordy Aramani?
24  A.   Yes.  He -- I also provided during a break his
25  e-mail -- his mailing address.